UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  5/5/2025

PALISADES ESTATES EOM, LLC, et al.,

Plaintiffs,

v.

COUNTY OF ROCKLAND, *et al.*,

Defendants.

No. 23-cv-4215 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

On May 22, 2023, Palisades Estates EOM, LLC ("Armoni"), Newburgh EOM LLC d/b/a Crossroads Hotel ("Crossroads"), Ratan Newburgh LLC d/b/a Ramada by Wyndham ("Ramada"), South Road Hospitality, LLC ("South Road"), Hudson Conference Center, LLC ("Hudson Conference"), Route 9 Hotel LLC ("Route 9"), Sai Ram Management LLC ("Sai Ram"), Sandip Patel ("Patel"), AIMS Newburgh Management LLC ("AIMS Newburgh"), AIMS Orangeburg Management LLC ("AIMS Orangeburg"), CWP Syracuse I LLC ("CWP Syracuse"),  ES Albany LLC ("ES Albany") (collectively, the "Hotel Plaintiffs"), and Rapid Reliable Testing LLC ("RRT") (together with the Hotel Plaintiffs, "Plaintiffs") filed the instant action against Defendants County of Rockland, New York, and Edwin J. Day, in his official capacity as County Executive of Rockland County (together, "Rockland"), County of Orange, New York, and Steven M. Neuhaus, in his official capacity as County Executive of Orange County ("Orange"), the Town of Orangetown, New York, and Teresa M. Kenny, in her official capacity as Town Supervisor of the Town of Orangetown (together "Orangetown"), the Town of Newburgh, New York, Gilbert J. Piaquadio, in his official capacity as Town Supervisor of the Town of Newburgh

(together, "Newburgh"), County of Dutchess, New York, William F.X. O'Neil, in his official capacity as County Executive of Dutchess County, Dutchess Department of Community and Family Services, Sabrina J. Marzouka, in her official capacity as Commissioner of the Dutchess County Department of Family Services (together, "Dutchess"), Town of Poughkeepsie ("Poughkeepsie"), County of Rensselaer, New York ("Rensselaer"), County of Herkimer, New York ("Herkimer"), County of Oneida, New York ("Oneida"), County of Broome, New York ("Broome"), County of Genesee, New York ("Genesee"), County of Orleans, New York ("Orleans"), County of Saratoga, New York ("Saratoga"), County of Greene, New York ("Greene"), County of Sullivan, New York ("Sullivan"), County of Onondaga ("Onondaga"), County of Chautauqua ("Chautauqua"), County of Fulton ("Fulton"), County of Madison ("Madison"), County of Niagara ("Niagara"), County of Oswego ("Oswego"), County of Otsego ("Otsego"), County of Schoharie ("Schoharie"), County of Schuyler ("Schuyler"), County of Suffolk ("Suffolk"), County of Tioga ("Tioga"), County of Wyoming ("Wyoming") (together with Rockland, Orange, Dutchess, Rensselaer, Herkimer, Oneida, Broome, Genesee, Orleans, Saratoga, Greene, Sullivan, Onondaga, Chautauqua, Fulton, Madison, Niagara, Oswego, Otsego, Schoharie, Schuyler, Suffolk, and Tioga,  the "Counties"), Town of Salina ("Salina"), and Town of Colonie ("Colonie") (Orangetown, Newburgh, Poughkeepsie, Salina, and Colonie, the "Towns") (all of the foregoing, collectively, "Defendants").

Plaintiffs filed a Second Amended Complaint (the "SAC", ECF No. 200) on July 13, 2023 asserting claims under: (i) the Contract Clause of the United States Constitution; (ii) Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.* ("Title II"); (iii) the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United

States Constitution; (iv) Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); (v) the Takings Clause of the Fifth Amendment to the United States Constitution; (vi) the Supremacy Clause of the United States Constitution and further alleging the emergency orders and certain enforcement actions undertaken by Defendants are preempted by federal law; (vii) 42 U.S.C. § 1983 ("Section 1983"); and (viii) the Fourth Amendment to the United States Constitution.

On August 10, 2023, Plaintiffs filed a motion for preliminary injunction seeking to enjoin the enforcement and utilization of certain emergency orders issued by the Counties and the use of local municipal laws by the Defendants to harass, punish, and prevent the Plaintiffs from providing public accommodation, transportation, and other resources to certain refugees seeking asylum in the United States. (ECF No. 239). The parties and the Court engaged in significant correspondence, resulting in certain Defendants filing a Motion to Sever Claims and Transfer Venue (ECF No. 345) and Defendants, writ large, filing a Joint Motion to Dismiss (ECF No. 353). All the foregoing motions are presently before the Court.

Upon the Court's consideration of the parties' moving and opposition papers, the Court DENIES Plaintiffs' application for preliminary injunction, GRANTS, in part, and DENIES, in part, Defendants' Motion to Dismiss, and GRANTS, in part, and DENIES, in part the Severance Defendants[1] Motion to Sever Claims and Transfer Venue.

---

[1] As defined below.

## **FACTUAL BACKGROUND**

The following facts are taken from Plaintiffs' SAC and its accompanying exhibits,[2] and are taken as true for purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I.    **THE PLAINTIFFS**

Armoni and AIMS Orangeburg are limited liability companies operating hotels located in Orangeburg. (SAC ¶¶ 62, 72). Orangeburg is located in Rockland. (*Id*. ¶ 79).

Crossroads, Ramada, and AIMS Newburgh are limited liability companies operating hotels located in Newburgh. (*Id*. ¶¶ 63-64, 71). Newburgh is located in Orange. (*Id*. ¶ 145).

South Road, Hudson Conference, Route 9, and Sai Ram are all limited liability companies operating hotels located in Poughkeepsie. (*Id*. ¶¶ 65-68). Poughkeepsie is located in Dutchess. (*Id*. ¶ 161).

CWP Syracuse is a limited liability company operating a hotel in Woodmere, New York. (*Id*. ¶ 73). CWP Syracuse's hotel is located in Onondaga. (*Id*. ¶ 255).

ES Albany is a limited liability company operating a hotel in Colonie. (*Id*. ¶ 74). Colonie is located in Albany. (*Id*. ¶ 375).

Patel is an individual residing in New Jersey and although not specifically stated, appears to be an owner of a public accommodation space. (*Id*. ¶ ¶ 69, 162).

RRT is a limited liability company operating out of New York City which has entered into a contractual obligation with New York City to identify and engage hotels to provide temporary housing to Refugees. (*Id*. ¶ ¶ 12,13,70).

---

[2] Citations to such exhibits will be noted as "SAC Ex.".

## II.    THE MIGRANT CRISIS

At its core, this matter involves non-white minorities who are seeking asylum in the United States after leaving Latin American countries and entering the country through Texas and Florida (the "Asylum Refugees"). (*Id.* ¶ 2). The Asylum Refugees left their home countries as result of a "growing humanitarian crisis", and the United States Government has implemented a program that, first, increases the number of asylum seekers entering the country and, second, seeks to transfer those refugees to other cities in the United States. (*Id.* ¶ 6).

In response to this influx of Asylum Refugees into its borders, Texas began bussing groups of Asylum Refugees to New York City, as well as other large cities. (*Id.* ¶ 7). As of May 2023, roughly 79,000 Asylum Refugees had reached New York City. (*Id.* ¶ 8).

In October 2022, New York City's Mayor Eric Adams declared a state of emergency and directed the establishment of Humanitarian Emergency Response and Relief Centers, which provided temporary shelter, food, and medical care to Asylum Refugees. (*Id.* ¶ 9). Even so, the City's ability to provide shelter and basic services to the unprecedented number of Asylum Refugees was greatly strained. (*Id.* ¶¶ 8, 10).

Given this strain, Mayor Adams instituted a humanitarian program (the "Humanitarian Program") by which New York City would arrange for temporary public accommodations and transportation of a number of Asylum Refugees to nearby New York State counties. (*Id.* ¶ 121). As part of that program, New York City entered into a contract with RRT to provide services and to assist in temporarily accommodating the Asylum Refugees by making arrangements with the Hotel Plaintiffs (*Id.* ¶¶ 14, 121).

### III.    THE COUNTIES' & TOWNS' RESPONSE

Following the establishment of the Humanitarian Program, each of the Counties enacted Emergency Orders prohibiting, *inter alia*, the public accommodation and transportation of Asylum Refugees within the Counties' territorial limits. (*Id*. ¶ 122). The various emergency orders detailed in this section are hereinafter collectively referred to as the "Emergency Orders".

#### A.  The Hotel Counties & Towns

The following counties[3] and towns each contain at least one of the Hotel Plaintiffs.

#### i.  Rockland County & Orangetown

On May 6, 2023, Rockland issued an emergency order (the "Rockland Order") barring any person, entity, or municipality from entering into a contract to "transport migrants or asylum seekers to locations" in the county or "for the purpose of providing housing accommodations for migrants or asylum seekers without a license granted by [Rockland]". (*Id*. ¶ 125; SAC Ex. A-1). The Rockland Order authorizes the county sheriff to issue tickets mandating court appearances and contemplates civil penalties. (SAC ¶ 125; SAC Ex. A-1). It also levies a fine of $2,000 per Asylum Refugee housed within the county. (SAC ¶ 128; SAC Ex. A-1).

That same day, County Executive Ed Day stated on a radio appearance that the Asylum Refugees "are not vetted, we have child rapists, we have criminals, we have people who are MS-13." (SAC ¶ 130). On May 8, 2023, during a television appearance, County Executive Day reiterated his concern that the Asylum Refugees are not vetted and stated "[w]hat's going to happen if [the Asylum Refugees] come here, they're going to stay here.

---

[3] Rockland, Orange, Dutchess, Onondaga, and Albany the "Hotel Counties".

They're not going back anywhere. They're going to keep growing and growing." (*Id*. ¶ 131).

The following day, Orangetown brought an action against Armoni in Rockland County Supreme Court seeking an *ex parte* temporary restraining order ("TRO")—and expressly relied on the Rockland Order in doing so. (*Id*. ¶¶ 132, 134); *see also Town of Orangetown, N.Y., v. Armoni Inn & Suites, LLC, et al.*, Index No. 032048-2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023) (the "Orangetown Action"). A day before initiating that suit, Orangetown Town Supervisor stated during a television appearance that "[o]ur concern is public safety . . ." and echoed County Executive Day's concerns about background checks for the Asylum Refugees. (*Id*. ¶ 133). Orangetown also alleged zoning violations against the Hotel Plaintiffs located within its borders, which Plaintiff asserts were selective prosecutions and enforcements of facially neutral laws with discriminatory intent and purpose. (*Id*. ¶ 135). Orangetown was granted a preliminary injunction on June 9, 2023. (*Id*. ¶ 140).

Rockland initiated its own action, *In the Matter of the Application of The County of Rockland, et al. v. City of New York, et al.*, Index No. 032065-2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023) (the "Rockland Action"), against Armoni on May 9, 2023 and obtained a TRO preventing Armoni from the transporting Asylum Refugees into Rockland for the purpose of renting and renting, generally, any and all rooms in all hotels, motels, and all short term rentals located in Rockland. (*Id* ¶ 136). Similarly, that action also expressly relied on the Rockland Order. (*Id*.  137). Rockland also denied Armoni a temporary residence permit, necessitating Armoni close indefinitely. (*Id*. ¶ 139). Armoni was forced to displace its ordinary guests and cancel all of its future reservations. (*Id*.). For

a period of days after shutting down, Armoni was also monitored by county law enforcement twenty-four hours per day. (*Id*.).

In sum, the court actions and alleged selective, discriminatory enforcement prevent RRT and Armoni from contracting or making public accommodations to Asylum Refugees in Rockland County, which includes Orangetown. (*Id*. ¶ 141).

### ii.   Orange County & Newburgh

Orange issued its own emergency order (the "Orange Order") on May 8, 2023, which expressly prohibited Plaintiffs from transporting Asylum Refugees into the county and renting them rooms in hotels, motels, and short-term rental located therein. (*Id*. ¶ 142). As with the Rockland Order, the Orange Order prohibits "hotels, motels, and/or any facilities allowing short-term rentals [from] accept[ing] migrants and/or asylum seekers from housing within Orange County." (*Id*. ¶ 143; *see also* SAC Ex. A-2). The Orange Order contemplates relying on "local zoning codes" to refuse or evict "migrants and/or asylum seekers . . ." from hotels and other short-term residential facilities. (SAC ¶ 145; SAC Ex. A-2).

During a media appearance, County Executive Steve Neuhas stated the Orange Order "tells hotels here do not accept any of these asylum seekers and that's the way it's going to be." (*Id*. ¶ 146). In another media appearance, County Executive Nehaus also expressed concerns regarding the Asylum Refugees' history, stating "we have no idea who these people are. We have no idea what their backgrounds are." (*Id*. ¶ 147). He also flatly stated "I am opposed to these asylum seekers being sent to our communities." (*Id*.).

On May 12, 2023, Orange commenced two separate state court actions against Crossroads and Ramada: (1) *In the Matter of the Application of The County of Orange, et*

*al. v. The City Of New York, et al.* Index No. 003109-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023) (the "Orange Petition") and (2) *The County of Orange v. The Crossroads Hotel, et al.*, Index No. 003107-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023) (the "Orange Action"). (*Id.* ¶ 148; SAC Ex. G). Newburgh also initiated its own state court action against Crossroads, *Town of Newburgh, New York v. Newburgh EOM LLC, et al.*, Index No. 003105-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023) (the "Newburgh Action"). (SAC ¶ 148; SAC Ex. E).

Plaintiffs allege that Newburgh selectively prosecutes and enforces the Orange Order and its facially neutral zoning laws in a discriminatory manner and with discriminatory intent. (SAC ¶ 149). Prior to commencing the Newburgh lawsuit, Town Supervisor Gil Piaquadio recounted a conversation with Mayor Adams regarding his "concerns . . . to the absence of background checks on these sixty [Asylum Refugees . . . .]" and stated "the safety of the Town of Newburgh residents is most important." (*Id.* ¶ 150).

On May 16, 2023, Orange and Newburgh were granted TROs in their respective state court actions enjoining Crossroads, Ramada, and RRT from providing public accommodations to any additional Asylum Refugees or "altering, changing, using or operating the subject properties . . . as shelter for non-transient guests . . . as [to do so] violates [the OC Order.]" (*Id.* ¶ 151; SAC Ex. B). On June 21, 2023, the state court granted Orange a preliminary injunction preventing Crossroads and Ramada, expressly, and AIMS Newburgh and AIMS Orangeburg, via reference to "hotels within Orange County," from making public accommodations available to Asylum Refugees. (SAC ¶ 152; SAC Ex. C).

Collectively, the court orders, Orange Order and Newburgh's alleged selective discriminatory and pretextual enforcement of local laws prevent RRT, Ramada, AIMS Newburgh, and AIMS Orangeburg from making public accommodations to the Asylum Refugees in Orange, which includes Newburgh. (SAC ¶ 153).

### iii. Dutchess County & Poughkeepsie

Dutchess declared a state of emergency and issued its own emergency order (the "Dutchess Order") on May 18, 2023 because of anticipated "enforcement of local [laws] asylum seekers may face refusal, removal, or eviction from hotels, motels, or short term rentals converted into emergency shelters . . . resulting in homelessness for vulnerable migrants and/or asylum seekers . . . ." (Compl Ex. A-3). The Dutchess Order was expressly enacted in response to "a national immigration crisis in the United States [that] has resulted in thousands of migrants and/or asylum seekers entering the United States . . . ." (*Id.*). As part of its justification for declaring a state of emergency, Dutchess cited the conflicting information regarding the "date, time, location, and number of homeless individuals arriving" in the county, which "may incite public panic [and] creates an immediate apprehension of a public emergency which imperils public safety . . . ." (*Id.*) The Dutchess Order explicitly references South Road's negotiations with New York City to house Asylum Refugees. (*Id.*; *see also* SAC ¶ 157).

The operative Dutchess Order prohibits "all hotels, motels, or any buildings allowing short-term overnight rentals" in Dutchess from modifying any building or operating "as an emergency shelter, homeless shelter, rooming house, or other long-term overnight shelter." (Weisbord Decl. Ex. O). The Dutchess Order also prohibits the transfer of operations of any "hotel[], motel[], or any buildings allowing short-term overnight

rentals" within Dutchess to any other entity "for use of the building as an emergency shelter, homeless shelter, rooming house, or other long-term overnight shelter." (*Id*.).

Prior to issuing the Dutchess Order, County Executive William F.X. O'Neil wrote a letter to local hotels thanking those who refused to accept Asylum Refugees and requesting that those who were considering taking in Asylum Refugees "to consider the implications of your decision for the broader community . . . ." (SAC ¶ 158). On May 19, 2023, County Executive O'Neil explained his rationale behind the state of emergency was to "preserve our rights and safeguard the well-being of our residents and our community by enforcing various established codes and regulations . . . ." (*Id*. ¶ 159). County Executive O'Neil expressly referred to Route 9 as one of the hotels seeking to house Asylum Refugees. (*Id*.).

On May 24, 2023, the Majority Leader of the Dutchess County Legislature, Will Truitt, accorded with County Executive O'Neil, stating that he "want[s] to make it clear that I am adamantly opposed to our local hotels housing migrants, and that Dutchess does not have the resources to do this." (*Id*. ¶ 160). Majority Leader Truitt also referenced delaying one bus of "migrants" New York City intended to send Dutchess and intended to stay "vigilant to both delay and cancel any future plans." (*Id*.)

On May 19, 2023, Dutchess and Poughkeepsie, located therein, initiated separate legal actions seeking injunctive relief: *In the Matter of the Application of The County of Dutchess, et al. v. The City of New York, et al.*, Index No. 2023-51697 (Dutchess Cnty. Sup. Ct. filed May 19, 2023) (the "Dutchess Petition") as against, pertinently, Route 9 and Sai Ram, and *Town of Poughkeepsie v. South Road Hospitality LLC d/b/a Red Roof Plus, et al.*, Index No. 2023-61688 (Dutchess Cnty. Sup. Ct. filed May 19, 2023) (the

"Poughkeepsie Action") as against, pertinently, South Road, Hudson Conference, and Patel. (*Id*. ¶¶ 161-62; *see also* SAC Exs. H, I). On May 23, 2023, a Dutchess County Supreme Court Justice issued a TRO enjoining the "transportation of] any so-called migrants and/or asylum seekers and/or asylum refugees to the County of Dutchess . . . ." (*Id*. ¶ 163).

Accordingly, RRT, South Road, Hudson Conference, Route 9, Sai Ram, and Patel are prohibited from providing public accommodations and transportation to Asylum Refugees in Dutchess. (*Id*. ¶ 164).

### iv. Onondaga County & Salina

On May 18, 2023, Onondaga declared a state of emergency as a result of "historic numbers" of "illegal border crossings" leading to "tens of thousands of migrants with immediate housing and service needs . . . arriv[ing] in the City of New York" because Onondaga lacked the "capacity or resources to receive and sustain an increase in the number of migrants, imperiling public health and safety . . . ." (*Id*. ¶ 248; SAC Ex. A-13).

Onondaga issued an emergency order the same day (the "Onondaga Order") preventing any "Municipality [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive." (SAC Ex. A-13). The Onondaga Order further prohibits any "hotel, motel or owner of a multiple dwelling" from housing "migrants or asylum seekers without a license granted by the County." (*Id*.). The Onondaga Order authorizes the issuance of appearance tickets and the imposition of

civil fines not to exceed $2,000 per "migrant/asylum seeker" housed in violation of the order per day. (*Id.*).

Prior the Onondaga Order's issuance, Onondaga County Executive Ryan McMahon recounted his concerns during a media appearance, stating that "[w]e're concerned about the idea of numerous single males coming to our community with no ability to work, housing these individuals, monitoring these individuals who we don't know who they are . . ." and concluding that to allow such individuals to stay within the county would be a "recipe for real problems." (SAC ¶ 252). Executive McMahon also tweeted in this time period imploring the federal government to "secure the border" and reiterated that "[b]y no means at this point [is Onondaga County] prepared to accept migrants from other governments." (*Id.* ¶ 253).

On May 22, 2023, Onondaga initiated an action seeking to enjoin CWP Syracuse from housing Asylum Refugees, *In the Matter of the Application of County of Onondaga v. City of New York, et al.*, Index No. 005214/2023 (Onondaga Cnty. Sup. Ct. filed May 24, 2023) (the "Onondaga Action"). (SAC ¶ 255). Salina filed its own action against CWP Syracuse on May 23, 2023, seeking to enjoin the "conversion" of a CWP Syracuse hotel such that it would violate zoning provisions of the Salina Town Code. *Town of Salina, New York v. CWP Syracuse I LLC*, Index No. 005226-2023 (Onondaga Cnty. Sup. Ct. filed May 23, 2023) (the "Salina Action"). On May 23, 2023, both courts in the foregoing matters granted TRO applications against CWP Syracuse. (*Id.* ¶ 259; *see also* SAC Ex. B).

Prior to Salina filing its action, Salina Town Supervisor Nick Paro made numerous media appearances wherein he stated "[o]ur residents fear what will happen to their neighborhood if one, or two, or ten buses of illegal migrants roll into our town . . ." and

vowed that "[m]y office will use what resources we do have to fight back against this blatant disregard for Salina and its residents" and would "fight back against . . . becoming New York City's dumping ground for their illegal immigrant problem." (SAC ¶ 258).

Plaintiffs allege that on June 14, 2023, Onondaga and Salina law enforcement officials conducted a warrantless entry and search of rooms at one of CWP Syracuse's hotels. (*Id.* ¶ 260). Not long after, Onondaga social workers, Salina's Fire Marshal, and an Onondaga attorney performed a second warrantless entry of CWP Syracuse's hotel. (*Id.*). The Onondaga attorney stated this group was at the hotel looking for "illegal immigrants". (*Id.*). CWP Syracuse employees requested a warrant from this group, which they were unable to provide and, consequently, left the premises. (*Id.*).

Plaintiffs allege that Onondaga and Salina's actions violate RRT and CWP Syracuse's rights under Title II, Section 1981, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. (*Id.* ¶ 261).

### v. Albany County & The Town of Colonie

On May 23, 2023, Albany declared a state of emergency in anticipation of "migration of migrants and/or asylum seekers into . . . Albany, which will result in a severe housing crisis as a result of the limited number of temporary and permanent housing available in the County." (*Id.* ¶ 371; SAC Ex. A-26). The same day, Albany issued an emergency order (the "Albany Order") prohibiting any

> hotel, motel, owner of a multiple dwelling, or shelter in Albany County is [from] contract[ing] or otherwise engag[ing] in business with any other municipality other than the County of Albany (an "external municipality") for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County.

(SAC Ex. A-26). Moreover, the Albany Order prohibits any "hotel, motel, owner of a multiple dwelling, or shelter" from contracting to provide housing or accommodations to

"migrants or asylum seekers" without a license. (*Id.*). Licenses will be issued subject to the County Commissioner of Social Service's "satisfaction" that certain criteria are met. (*Id.*).

Albany has never sought to enforce the Albany Order. (SAC ¶ 375). However, Plaintiffs allege that the Albany Order nevertheless violates their rights under the Constitution and federal civil rights statutes. (*Id.* ¶ 373).

Colonie, on the other hand, initiated an action against a hotel owned by ES Albany located within the town on May 27, 2023 seeking to enjoin ES Albany from housing Asylum Refugees, *In the Matter of the Application of The Town of Colonie, et al. v. The City of New York, et al.*, Index No. 904641-2023 (Albany Cnty. Sup. Ct. filed May 27, 2023) (the "Colonie Action").  (*Id.* ¶ 375; SAC Ex. M).

The day after filing the suit, Colonie Town Supervisor Peter G. Crummey referred to Asylum Refugees as "persons of unknown healthy, dietary, and behavioral histories"— and refused to elaborate on these comments in follow-up questions. (SAC ¶ 376). Colonie's request for an injunction was denied on June 9, 2023. (*Id.* ¶ 377).

Plaintiffs allege that if "Colonie's selective discriminatory enforcement of its local laws pursuant to the Albany . . . Order is permitted to stand," RRT and ES Albany will be prohibited from performing their lawful obligations. (*Id.* ¶ 378).

### B.  The Non-Hotel Counties

In the following counties, Rensselaer, Broome, Oneida, Schuyler, Tioga, Herkimer, Oswego, Otsego, Genesee, Greene, Orleans, Chautauqua, Niagara, Sullivan, Wyoming, Fulton, Madison, Saratoga, Schoharie, and Suffolk (the "Non-Hotel Counties") none of the Hotel Plaintiffs have establishments/facilities located within their confines. RRT, however, asserts that each of their respective emergency orders violates its constitutional and federal

15

statutory civil rights. (*See Id.* ¶¶ 174, 182, 192, 202, 209, 217, 228, 238, 247, 273, 283, 293, 302, 312, 320, 329, 337, 346, 354, 363).

### i. Rensselaer County

On May 9, 2024, Rensselaer declared a state of emergency because of an incapacity to "receive and sustain an extraordinary number of illegal aliens" and that hosting such "illegal aliens . . . imperils the public safety within the County of Rensselaer . . . ." (*Id.* ¶ 165; *see also* SAC Ex. A-4). That same day, Rensselaer issued an emergency order (the "Rensselaer Order") prohibiting any "municipality [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive." (SAC ¶ 166; SAC Ex. A-4). The Rensselaer Order also authorizes the Sheriff to issue appearance tickets and contemplates the imposition of a fine not to exceed $2,000 per Asylum Refugee for any violation of said order. (SAC ¶ 170; SAC Ex. A-4).

In announcing the Rensselaer Order, County Executive Steve Mclaughlin equated New York City's program as akin to "human trafficking from New York City into other areas upstate . . ." and stated Rensselaer "do[es] not have the structure or the resources to take care of these people being forced out of New York City." (SAC ¶¶ 171-72). Plaintiffs allege that the Rensselaer Order violates RRT's constitutional and federal rights under Title II, Sections 1981 and 1983, and the Contract Clause and Fifth and Fourteenth Amendments of the United States Constitution. (*Id.* ¶ 174).

### ii. Broome County

On May 11, 2023, Broome declared a state of emergency due to the county "experiencing a housing crisis" and stating it "is not capable of receiving and sustaining any number of migrants and / or asylum seekers." (SAC Ex. A-7). An emergency order (the "Broome Order") followed that same day, prohibiting any

> municipality [from] mak[ing] any contracts with persons, business, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive or his designee.

(*Id.*). The Broome Order also prohibits any "hotel, motel, owner of a multiple dwelling, or shelter" within the county from contracting to provide housing or accommodations to Asylum Refugees absent a license from the county. (*Id.*). Further, the Broome Order provides that violations constitute a Class B Misdemeanor, authorizes the sheriff to issue appearance tickets, and imposes civil fines of $2,000 per Asylum Refugee housed in the county per day in violation of the order. (*Id.*).

In comments to the media regarding the Broome Order's rationale, Broome County Executive Jason Garnar stated "[t]he limited resources we have are for Broome County residents first and foremost; we do not have the capacity to take on large groups of people should they arrive in our community." (SAC ¶ 200).

Plaintiffs allege the Broome Order violates and interferes with RRT's constitutional rights.

### iii. Oneida County

On May 11, 2023, Oneida declared a state of emergency, expressly referencing the Humanitarian Program and stating "unrestricted, unlawful migrations poses a grave risk to the social health, and emergency services resources of the County, particularly . . . when

the County's inventory of housing and emergency housing is at historic lows . . . ." (*Id*. ¶ 183; *see also* SAC Ex. A-6). The declaration also defines "Migrants", as used therein, as "persons seeking asylum or who have illegally entered and remained in the United States . . . ." (SAC Ex. A-6).

The same day, Oneida County issued an emergency order (the "Oneida Order"), which uses the same definition of "Migrants" as the declaration—"persons seeking asylum or who have illegally entered and remained in the United States . . . ." (SAC Ex. A-6). The Oneida Order prohibits any

> person, business or entity doing business within the County of Oneida [from] agree[ing] or contract[ing] with any municipality to transport to or within the County of Oneida any Migrant without the prior permission of the County Executive or his designee, such permission to be given only after determining that such agreement or contract would not jeopardize the health, safety, or welfare of the County and its residents.

(SAC Ex. A-6). The Oneida Order also prohibits any "hotel, motel, shelter, campground, or owner of a multiple dwelling in the County" from contracting to provide accommodations to Asylum Refugees. (*Id*.). The Oneida Order deems violations to be Class B Misdemeanors, authorizes the sheriff to issue appearance tickets, and imposes $2,000 civil fine per day and per Asylum Refugee transported to or housed in the county in violation of the order. (SAC ¶ 188; SAC Ex. A-6).

In describing the Oneida Order, County Executive Anthony J. Picente stated the order "prevent[s] any of the hotels or shelters from accepting any of the busloads or any migrants that were being sent up here from New Yew York City or from Albany." (SAC ¶ 189). County Executive Picente conceded that Oneida does use hotels to house county families in emergency situations, but distinguished the Asylum Refugees because, in the former case, "the emergency services [are] temporary . . . . [With respect to Asylum

Refugees, the services] are not [permanent] so what do we do with them?" (*Id*. ¶ 190). County Executive Picente went on to raise concerns about providing food and care to Asylum Refugees, as well as the health conditions of the Asylum Refugees. (*Id*.)

Plaintiffs allege that the Oneida Order unlawfully interferes with RRT's constitutional and federal rights and prohibits RRT from entering into intended agreements to provide public accommodations to Asylum Refugees in Oneida. (*Id*. ¶ 192).

### iv. Schuyler County

On May 11, 2023, Schuyler declared a state of emergency because Schuyler lacks "the capacity or resource to receive and sustain an increase in the number of illegal immigrants, migrants, and/or asylum seekers [and] the immediate danger of a significant increase in the number of illegal aliens, migrants, and/or asylum seekers entering . . . Schuyler imperils the public safety . . . ." (*Id*. ¶ 330; SAC Ex. A-21). Concurrently, Schuyler issued an emergency order (the "Schuyler Order"), which prohibited any

> municipality [from] mak[ing] contracts with persons, businesses, or entities
> doing business within the County to transport illegal immigrants, migrants
> and/or asylum seekers to locations in the County, or to house such persons
> at locations in the County for any length of time without the express written
> permission of the County.

(SAC Ex. A-21). Moreover, the Schuyler Order prevents any "hotel, short-term rental, motel, or owner of a multiple dwelling" from contracting to provide housing or accommodations to "illegal immigrants, migrants, and/or asylum seekers" unless granted a license by the county. (*Id*.). Licenses are granted subject to the Public Health Director of the Schuyler County Department of Health's "satisfaction" that applicants meet certain conditions. (*Id*.). Finally, the Schuyler Order authorizes the issuance of appearance tickets, $2,000 civil fines per Asylum Refugee housed in violation of the order per day and renders any violations a Class B Misdemeanor. (*Id.*).

Plaintiffs allege that the Schuyler Order violates RRT's constitutional and federal civil rights. (SAC ¶ 337).

### v.  Tioga County

Tioga declared its own state of emergency on May 11, 2023 because "Tioga is experiencing a housing crisis" and thus "is not capable of receiving or sustaining any number of migrants and/or asylum seekers." (*Id*. ¶ 347; SAC Ex. A-23). Tioga also issued an emergency order (the "Tioga Order") on May 11, 2023 prohibiting any "Municipality [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Legislative Chair." (SAC Ex. A-23). Further, the Tioga Order prevents any "hotel, motel, or owner of a multiple dwelling" from contracting to provide housing or accommodations to "migrants or asylum seekers without a license granted by the County." (*Id*.). The Tioga Order authorizes the issuance of appearance tickets, the imposition of $2,000 civil fines per Asylum Refugee housed in violation of the order per day, and renders violations a Class B Misdemeanor. (*Id*.).

Plaintiffs allege that the Tioga Order violates RRT's constitutional and federal civil rights. (SAC ¶ 354).

### vi.  Herkimer County

Herkimer declared a state of emergency on May 12, 2023, stating that, because the county is experiencing a housing crisis, it was "not capable of receiving or sustained any number of migrants and/or asylum seekers." (*Id*. ¶ 175; *see also* SAC Ex. A-5). That same day, the county issued an emergency order (the "Herkimer Order") proscribing any

"municipality [from] mak[ing] contracts . . . to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the Chairman of the Herkimer County Legislature." (SAC ¶ 176; SAC Ex. A-5). The Herkimer Order also proscribes any "hotel, motel, or owner of a multiple dwelling in Herkimer County [from] contract[ing] or otherwise engag[ing] with any other municipality other than the County of Herkimer . . . for the purpose of providing accommodations for migrants or asylum seekers without a license granted by the County." (SAC ¶ 176; SAC Ex. A-5).

In line with the Rennsselaer Order, the Herkimer Order authorizes the sheriff to issue appearance tickets and contemplates civil penalties not to exceed $2,000 "per migrant/asylum seeker" daily housed in the county in violation of the order. (SAC ¶ 179; SAC Ex. A-5). Violations of the Herkimer Order also amount to Class B Misdemeanors. (SAC ¶ 180; SAC Ex. A-5). Plaintiffs allege that the Herkimer Order violates RRT's constitutional and federal rights under Title II, Sections 1981 and 1983, and the Contract Clause and Fifth and Fourteenth Amendments of the United States Constitution. (SAC ¶ 182).

### vii.  Oswego County

Oswego declared a state of emergency on May 15, 2023[4] in response to New York City's "fail[ure] and refus[al] to adequately and humanely address the needs of its residents including homeless and those in need of temporary shelter transferred to New York City,

---

[4] The Court notes that the declaration of a state of emergency provided is a renewal and amendment to the original declaration and is dated June 14, 2024. (*See* SAC Ex. A-18). The May 15, 2023 declaration can be found at: https://oswegocountytoday.com/wp-content/uploads/2023/05/Emergency-Declaration-May-15-2023.pdf. (the "May Oswego Declaration"). The Court may take judicial notice of publicly available government documents and does so with respect to the May Oswego Declaration. *See Natural Resources Defense Council v. Dep't of the Interior*, 410, F. Supp.3d 582, 598 (S.D.N.Y. 2019) (citing *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp.3d 156, 166 (S.D.N.Y. 2015)).

[opting] instead . . . to[] transfer its duties and responsibilities to the other counties adjacent to New York City." (Id. ¶ 303; May Oswego Declaration). The declaration further states that "Oswego and its municipalities lack the resources and personnel to humanely house, educate and look after persons sent en masse from the City of New York's social services district", thus finding "reasonable apprehension of immediate danger of public emergency . . . ." (Id.).

On May 17, 2023, Oswego issued an emergency order (the "Oswego Order")[5] prohibiting any

> no municipality within the County of Oswego [from] mak[ing] contracts with persons, businesses, or entities doing business within the territorial limits of the County of Oswego to transport individuals en masse, from other social services districts for the purpose of sheltering these individuals their own municipality, to locations within the county, or to house those persons at locations in the county for any length of time without the express written permission of the Chair of the County Legislature or designee.

(SAC ¶ 304; Oswego Order). The Oswego Order further prohibits any "hotel, motel, owner of a multiple dwelling, or shelter" from contracting to provide housing or accommodations to "migrants or asylum seekers" without a license from Oswego. (Oswego Order). Licenses are subject to the Director of Public of Health of the Oswego County Public Health Department's "satisfaction" that certain conditions are met. (Id.). Moreover, the Oswego

---

[5] Similarly, the emergency order provided is an amendment and reissuance of the Oswego Order cited in the Complaint and is dated June 13, 2023. (See SAC Ex. A-18). The original May 17, 2023 Oswego Order can be located at: https://cms3.revize.com/revize/oswegocountyny/County%20Legislature/Emergency%20Orders/2023/EO%202023-01.pdf. The Court also takes judicial notice of the original May 17, 2023 Oswego Order. See Natural Resources Defense Council, 410 F. Supp.3d at 598 (citing Wells Fargo Bank, N.A., 127 F. Supp.3d at 166)). The Court must presume that the Plaintiffs intend to challenge the Oswego Order and not the revised order because they quote from the original Oswego Order and not the revised order. (Compare Oswego Order with SAC ¶ 306 (noting that the original Oswego Order "expressly prohibit[s the] provis[ion of] housing or accommodations for migrants and asylum seekers . . . .")).

Order authorizes the issuance of appearance tickets and the imposition of $2,000 civil fines per Asylum Refugee housed in violation of the order per day. (*Id.*).

Oswego County Legislature Chairman James Weatherup defended the Oswego Order as "safeguard[ing] our taxpayers from shouldering the economic and social burden of controversial policies from Washington, [D.C.,] Albany, and New York City." (SAC ¶ 311).

Plaintiffs allege that the Oswego Order violates and interferes with RRT's constitutional and federal rights. (*Id.* ¶ 312).

### viii.  Otsego County

On May 16, 2023, Otsego declared a state of emergency prompted by "Otsego . . . already experiencing a housing crisis [and because] Otsego . . . is not capable of receiving and sustaining any number of migrants and/or asylum seekers." (Id. ¶ 313; SAC Ex. A-19). The same day, Otsego issued an emergency order (the "Otsego Order") prohibiting any

> municipality [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Board Chair or his designee.

(SAC Ex. A-19). The Otsego Order also prevented any "hotel, motel, owner of a multiple dwelling, or shelter" from contracting to provide housing or accommodations to "migrants or asylum seekers" absent a license from Otsego. (*Id.*). Such a license is subject to the Health Department Director's "satisfaction" that the applicant has met certain criteria. (*Id.*). Finally, the Otsego Order authorizes the issuance of appearance tickets, $2,000 civil fines per Asylum Refugee housed in violation of the order per day and renders any violations a Class B Misdemeanor. (*Id.*).

Plaintiffs allege that the Otsego Order violates and interferes with RRT's constitutional and federal civil rights. (SAC ¶ 320).

### ix.  Genesee County

Genesee declared a state of emergency on May 17, 2023 "arising from New York City's actions to rapidly divert the number of migrants to other Counties . . . to unsustainable levels." (SAC Ex. A-8; *see also* SAC ¶ 203). The declaration states that Genesee lacks the capacity "to receive or sustain any number of migrants and/or asylum seekers . . ." and describes the "situation [as] a threat to public safety." (*Id.*). Following the declaration, Genesee issued multiple emergency orders, with the most recent issued on June 16, 2023 (the "Genesee Order"). (SAC ¶ 204; *see also* SAC Ex. A-8).

The Genesee Order proscribes any

> hotel, motel, shelter, or other multiple-dwelling unit in Genesee County, or any person or corporation acting on behalf of such hotel, motel, shelter, or other multiple-dwelling unit, [from] enter[ing] into a contract with any municipality, corporation, partnership, individual, or any other entity for the purpose of providing emergency hosing for homeless individuals in Genesee County unless and until such person or corporation has submitted a plan detailing how it will provide adequate care and services for those individuals receiving emergency housing to the Genesee County Depart of Social Services . . . and such [plan] has been approved by the Genesee County Department of Social Services.

(SAC Ex. A-8). The Genesee Order authorizes the sheriff, among others, to issue appearance tickets and the imposition of civil fines of $2,000 per Asylum Refugee housed in violation of the Genesee Order per day. (*Id.*).

Genesee County Manager Matt Landers described the Genesee Order as in response to the possibility of "asylum seekers show[ing] up at our oder without our knowledge." (SAC ¶ 207). He further stated that "[w]e don't know [the Asylum Refugees']

background[s'] and they're going to be in our community embedded with us in a situation where we can't house our own homeless." (*Id*.).

Plaintiffs allege that the Genesee Order violates and interferes with RRT's constitutional and federal statutory civil rights. (*Id*. ¶ 209).

### x. Greene County

On May 17, 2023, Green declared a state of emergency "due to failed Federal Policy(ies) together with New York City's mismanagement and/or underestimation of the impact of inviting 'asylum seekers' to the city, resulting in New York City planning to relocate many migrants and asylum seekers to . . . Greene County." (*Id*. ¶ 229; SAC Ex. A-11). Greene also referenced significant shortages of housing, medical care, and transportation. (SAC Ex. A-11).

The same day, Greene issued an emergency order (the "Greene Order") resulting from "New York City's program to rapidly increase the number of migrants in the County to unsustainable levels", which would be exacerbated by the Humanitarian Program sending Asylum Refugees to the county. (*Id*.). As such, the Greene Order proscribes any

> Municipality [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the Chairman of the Greene County Legislature.

(*Id*.) The Greene Order further prevents any "hotel, motel, or owner of a multiple dwelling" from contracting to provide housing or accommodations to "migrants or asylum seekers" absent a license from Greene. (*Id*.). The Greene Order authorizes the sheriff to issue appearance tickets and the imposition of civil penalties not to exceed $2,000 per "migrant/asylum seeker" housed in violation of the Greene Order per day. (*Id*.). Licenses are conditioned on the County Administrator of the County of Greene's "satisfaction" that

certain conditions, including, without limitation, guarantees any Asylum Refugees will leave the county within fifteen days, that funding will be provided to "sustain the needs" of the Asylum Refugees, and the issuance of a performance bond of $2,000 per Asylum Refugee to Greene. (*Id*.). In discussing the Greene Order, County Legislature Chair Patrick Linger that, even though the county provides accommodations for its own homeless population in other New York counties, even fifteen Asylum Refugees would overwhelm the county's resources. (SAC ¶ 236).

Plaintiffs allege that the Greene Order violates and interferes with RRT's constitutional and federal statutory rights. (*Id*. ¶ 238).

### xi. Orleans County

On May 17, 2023, Orleans declared a state of emergency as a result of the county "experiencing a housing crisis" and, as consequently, "does not have the capability to receive or sustain any number of migrants and/or asylum seekers." (SAC Ex. A-9). The declaration describes such situation as "a threat to public safety." (*Id*.).

Orleans issued an emergency order that same day (the "Orleans Order"), which prohibits any

> municipality or entity [from] mak[ing] contracts with persons, businesses, or entites doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the Chairman of the Orleans County Legislature."

(*Id*.). The Orleans Order further prohibits any "hotel, motel, or owner of a multiple dwelling" from "providing housing or accommodations for migrants or asylum seekers without written approval granted by the County." (*Id*.). Violations of the order may be punished by the issuance of appearance tickets, civil penalties not to exceed $2,000 per

Asylum Refugee per day housed in violation of the order, or by a charge of a Class B Misdemeanor. (*Id.*).

Plaintiffs allege that the Orleans Order violates and interferes with RRT's constitutional and federal statutory civil rights. (SAC ¶ 217).

### xii.  Chautauqua County

On May 18, 2023, Chautauqua declared a state of emergency in response to the Humanitarian Program, stating that

> Chautauqua . . . is not capable of receiving and sustaining the volume of migrants and asylum seekers that New York City intends to send over, whose presences will spike the number of people in need of government services at all levels[,] and other services that require expenditure of local tax dollars with no aid from the Federal Government or [New York City, which] instigated this issue; and . . . there is no reason to believe that these migrants or asylum seekers will leave the County after New York City ceases to pay for the housing and any services they are presently receiving from New York City or that this will be the last time this kind of spike will occur; and . . . already Chautauqua . . . is struggling with . . . low income housing shortages . . . stressing services without the unneeded, unnecessary, and unnatural spike in population New York City's program will cause by the mass transportation of asylum seeking persons to Chautauqua . . . .

(*Id.* ¶ 263; SAC Ex. A-14). Chautauqua issued an emergency order (the "Chautauqua Order") the same day, which barred New York City from contracting with any person, business, or entity to transport or house Asylum Refugees within the county. (SAC ¶ 265).[6] Moreover, the Chautauqua Order bars all hotels, motels, and owners of multiple dwellings in Chautauqua from contracting to provide housing to Asylum Refugees absent a license from the County. (*Id.* ¶ 266). Licenses will only be issued subject to the "satisfaction" of the Chautauqua County Executive. (*Id.* ¶ 268). As for penalties, the Chautauqua Order

---

[6] Plaintiffs do not provide an actual copy of the original Chautauqua Order. A copy of the original May 18, 2023 Chautauqua Order can be found at: https://chqgov.com/sites/default/files/inline-files/Emergency%20Order%20No.%201%205.18.23.pdf. The Court also takes judicial notice of the original May 18, 2023 Chautauqua Order. *See Natural Resources Defense Council*, 410 F. Supp.3d at 598 (citing *Wells Fargo Bank, N.A.*, 127 F. Supp.3d at 166))

authorizes the issuance of appearance tickets, $2,000 civil fines per day and per Asylum Refugee housed in violation of the order and renders such violations Class B Misdemeanors. (*Id.*¶ 269).

Chautauqua County Executive Paul M. Wendel characterized his concerns with the Humanitarian Program as centered on the lack of information regarding the Asylum Refugees: "Without knowing anything about these individuals, it's hard to just say, 'Yes, we'll take them because they can't work.'" (*Id.*¶ 270).

Plaintiffs allege that the Chautauqua Order violates and interferes with RRT's constitutional and federal civil rights. (*Id.*¶ 273).

### xiii. Niagara County

Also on May 18, 2023, Niagara declared a state of emergency in response to New York City's Humanitarian Program to "bus Migrants[7] arriving in the City to counties outside of the City of New York, without assessing the capabilities of counties outside of the City of New York to house and feed and provide medical care to Migrant populations and lacking authority or jurisdiction to require the same." (*Id.* ¶ 294; SAC Ex. A-17). The same day, Niagara issued an emergency order (the "Niagara Order") proscribing any

> municipality [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the Chairman of the Niagara County Legislature.

(SAC Ex. A-17). The Niagara Order also prohibits any "hotel, motel, or owner of a multiple dwelling" from contracting to house Asylum Refugee without approval from Niagara. (*Id.*). Further, the Niagara Order authorizes the issuance of appearance tickets, the imposition of

---

[7] Defined as: persons seeking asylum or who have illegally entered and remained in the United States. (SAC Ex. A-17).

Case 1:25-cv-00413-JLS    Document 417    Filed 05/05/25    Page 29 of 121

$2,000 civil fines per Asylum Refugee housed in violation of the order per day, and deems all violations of the order a Class B Misdemeanor. (*Id*.).

Niagara County Legislature Majority Leader Randy Bradt, in comments to the media, stated that Niagara "lack[s] the resources" to accommodate Asylum Refugees and characterized New York City's policies with respect to Asylum Refugees as "ill-conceived polic[ies that have] produced the predictable results." (SAC ¶ 300).

Plaintiffs allege that the Niagara Order violates RRT's constitutional and federal civil rights. (*Id*. ¶ 302).

### xiv. Sullivan County

Sullivan declared its own state of emergency on May 18, 2023 because it is "currently experiencing a severe housing crisis" and thus "is not capable of receiving clients from other local services districts, including New York City, and providing housing to those individuals." (*Id*. ¶ 239; SAC Ex. A-12).

Concurrently, Sullivan issued an emergency order (the "Sullivan Order"), which prohibited any "municipality [from] mak[ing] contracts with persons, businesses, or entities within the County of Sullivan to house social services clients from another county for any length of time without the express consent of the County Manager." (SAC Ex. A-12). The Sullivan Order further prohibits any "hotel, motel, or owner of a multiple dwelling" from contracting to providing housing to "social service clients" without a license from Sullivan. (*Id*.). As penalties, the Sullivan Order prescribes the issuance of appearance tickets to violators. (*Id*.).

When informed by New York City that it intended to send Asylum Refugees to the county, Sullivan County Legislature Chair Robert Doherty stated the county would "do

what it needs to do – including availing itself of all rights and remedies provided by law" to oppose the Humanitarian Program. (SAC ¶ 245).

Plaintiffs allege that the Sullivan Order violates and interferes with RRT's constitutional and federal statutory civil rights. (*Id.* ¶ 247).

### xv. Wyoming County

On May 18, 2023, Wyoming declared a state of emergency in response to because "a housing crisis" within the county that prevents it from "receiv[ing] or sustain[ing] any number of migrants and/or asylum seekers." (*Id.* ¶ 347; SAC Ex. A-24). The same day, Wyoming issued an emergency order (the "Wyoming Order"), which prohibited any

> municipality or entity [from] mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the Chairwoman of the Wyoming County Board of Supervisors.

(SAC Ex. A-24). Further, the Wyoming Order prohibited any "hotel, motel, or owner of multiple dwelling" from contracting to provide housing or accommodations to "migrants or asylum seekers" with prior approval from Wyoming. (*Id.*). The Wyoming Order authorizes the issuance of appearance tickets, the imposition of $2,000 civil fines per Asylum Refugee housed in violation of the order per day, and renders violations a Class B Misdemeanor. (*Id.*).

In describing the rationale behind the Wyoming Order, County Chairwoman Rebecca Ryan explained that housing Asylum Refugees in the county would present a "grave risk to the social, health, and emergency services resources of the County." (*Id.*).

Plaintiffs allege that the Wyoming Order violates RRT's constitutional and federal civil rights. (SAC ¶ 363).

### xvi. Fulton County

Fulton declared a state of emergency on May 19, 2023 intended to "protect the public safety and public health during the migrant relocation crisis in New York State." (*Id*. ¶ 274; SAC Ex. A-15). The declaration seeks to "restrict public and/or private entities from transporting migrants or asylum seekers to locations within the county, or to house such persons within the county without express written permit [sic] issued by the Chairman of the Board of Supervisors." (SAC Ex. A-15). Also on May 19, 2023, Fulton issued an emergency order (the "Fulton Order") stating that "unrestricted, unlawful migration poses a grave risk to the social, health, and emergency services resources of Fulton . . . particularly during this period . . . when the County's inventory of housing and emergency housing is at historic laws . . . ." (*Id*.). The Fulton Order goes on to state "should the city of New York . . . abruptly transport large numbers of Migrants[8] to the County, the mass arrival of these Migrants will create a social, health and emergency services crisis . . . ." (*Id*.).

Accordingly, the Fulton Order prohibits any

> Municipality [from] making contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County or to house persons at locations in the County for any length of time without the express written permission of the Chairman of the Fulton County Board of Supervisors.

(*Id*.). It further prohibits any "hotel, motel, campground, rental business or owner of any dwelling" from contracting to provide housing to Asylum Refugees without a license from Fulton. (*Id*.). The Fulton Order also authorizes the issuance of appearance tickets, the imposition of $2,000 per day civil fines per Asylum Refugee and deems any violations of the order Class B Misdemeanors. (*Id*.).

---

[8] Defined as: persons seeking asylum or who have illegally entered and remained in the United States. (SAC Ex. A-15).

Fulton County Board of Supervisors Chairman Scott Horton described the Fulton Order as an effort to "join our other upstate counties, and other counties throughout the state, that are concerned about this. [The Fulton Order] is a way of protecting our people and sending a message that this is not the solution." (SAC ¶ 281).

Plaintiffs allege that the Fulton Order violates and interferes with RRT's constitutional and federal civil rights. (*Id*. ¶ 283).

### xvii.  Madison County

On May 19, 2023, Madison declared a state of emergency in response to New York City's "decision to[] transfer its duties and responsibilities [owed to migrants and asylum seekers] to the other counties adjacent to New York City . . . ." (*Id*. ¶ 284; SAC Ex. A-16). The declaration further raises concerns that, should Asylum Refugees be sent into Madison, "there is no reason to believe that these individuals will leave . . . after New York City ceases to pay for the housing and any services they are presently receiving in New York City, or that many more migrants or asylum seekers will not be transported to Madison County . . . ." (SAC Ex. A-16). Moreover, the declaration "anticipates the potential for civil disobedience and protesting on this issue both for and against the transportation of migrants/asylum seekers to Madison County", which otherwise is "not capable of receiving and humanely sustaining such volume of migrants and asylum seekers New York City may intend to, or hereafter does, transport to the County . . . ." (*Id*.).

The same day, Madison issued an emergency order (the "Madison Order") preventing any

> municipality within Madison County [from] making contracts with persons, businesses, or entities doing business within the territorial limits of Madison County to transport migrants or asylum seekers to locations in the county, or to house persons at locations in the county for any length of time without

the express written permission of the Chair of the Board of Supervisors or
his designee.

(*Id.*). The Madison Order further prohibited any "hotel, motel, owner of a multiple
dwelling, or shelter owner" from contracting to provide housing or accommodations to
Asylum Refugees absent a permit granted by Madison. (*Id.*). The Madison Order also
authorizes the issuance of appearance tickets, a $2,000 civil fine per Asylum Refugee
housed in violation of the order per day, and renders violations Class B Misdemeanors.
(*Id.*).

Plaintiffs allege the Madison Order violates RRT's constitutional and federal civil
rights. (SAC ¶ 293).

### xviii.   Saratoga County

Saratoga declared its own state of emergency on May 19, 2023, citing the "national
immigration crisis" at the Mexican border resulting in "an overwhelming number of illegal
immigrants, migrants and asylum seekers . . . crossing over the open border of the United
States . . . ." (*Id.* ¶ 218; SAC Ex. 10-A). The declaration also expressly references the
Humanitarian Program, states Saratoga lacks the "capacity or resources" and "adequate
infrastructure" to accommodate an influx of "illegal immigrants, migrants, and asylum
seekers . . . ." (SAC Ex. 10-A). The declaration goes further and anticipates "civil
disobedience" such that there is "reasonable apprehension of the immediate danger [of the]
public safety and public health [being] imperiled . . . ." (*Id.*).

Saratoga also issued an emergency order pursuant to the declaration on May 19,
2023 (the "Saratoga Order"). (SAC ¶ 220; SAC Ex. A-10). The Saratoga Order prevents
any

person, business, or entity doing business within the County of Saratoga
[from] agree[ing] or contract[ing] with any municipality to transport to or

within the County of Saratoga any Migrant[9] without the prior written permission of the Chief Executive or his designee, such permission to be given only after determining that such agreement or contract would not jeopardize the health, safety, or welfare of the County and its residents.

(SAC Ex. A-10). The Saratoga Order further prohibits any "hotel, motel, shelter, campground, short-term rental or owner of a multiple dwelling" from contracting to provided housing to any "Migrant" without the prior written permission of the county's Chief Executive. (*Id*.). The Saratoga Order only, however, authorizes the sheriff to issue appearance tickets and makes violations of the order Class B Misdemeanors. (*Id*.).

Subsequently, Saratoga announced that certain migrants would be exempt from the Saratoga Order. (SAC ¶ 224) For instance, migrants working at the Saratoga Race Course would be exempt. (*Id*.). Certain municipal employees located within the county objected to this carve out, with Spa City Public Safety Commission James Montagnino describing the distinctions drawn as "arbitrary". (*Id*. ¶ 225). In response, Saratoga County Spokeswoman Christine Rush clarified that the "[Saratoga O]rder clearly states that it is a prohibition of contracts with municipalities to transport or house migrants that jeopardize the health, safety, or welfare of the county. (*Id*. ¶ 226).

Plaintiffs allege that the Saratoga Order violates and interferes with RRT's constitutional and federal statutory rights. (*Id*. ¶ 228).

### xix. Schoharie County

Schoharie declared a state of emergency on May 19, 2023 arising from "a housing crisis due to the limited number of temporary and permanent housing units", and, consequently, "Schoharie . . . is not capable of receiving and sustaining any number of

---

[9] "Migrant" is noted defined in either the declaration of a state of emergency and the Saratoga Order. The Saratoga Order does reference "illegal immigrants, migrants and/or asylum seekers" in its preamble. (SAC Ex. A-10).

migrants and/or asylum seekers." (*Id*. ¶ 321; SAC Ex. A-20). In Schoharie's view, "[t]his situation threatens public safety." (SAC Ex. A-20). The same day, Schoharie issued an emergency order (the "Schoharie Order") preventing any

> municipality [from] mak[ing] contracts with persons, businesses, or entities doing business with the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Board Chair or his designee.

(*Id*.) The Schoharie Order also prohibits any "hotel, motel, owner of a multiple dwelling, or shelter" from contracting to provide housing or accommodations to "migrants or asylum seekers without a license granted by the County." (*Id*.). Licenses are granted subject to the County Health Department Director's "satisfaction" that applicants have met certain conditions. (*Id*.). The Schoharie Order authorizes the issuance of appearance tickets, $2,000 civil fines per Asylum Refugee housed in violation of the order per day and renders any violations a Class B Misdemeanor. (*Id*.).

Plaintiffs allege that the Schoharie Order violates RRT's constitutional and federal civil rights. (SAC ¶ 329).

### xx.  Suffolk County

On May 26, 2023, Suffolk declared a state of emergency as a result of certain states transporting "asylum seekers" to New York State and, as such, "the anticipated uncoordinated moving of people into . . . Suffolk will result in a severe housing crisis as a result of the limited number of temporary and permanent housing available in the County." (*Id*. ¶ 338; SAC Ex. A-22). Suffolk also issued an emergency order (the "Suffolk Order") the same day, which prohibits any

> hotel, motel, owner of a multiple dwelling, or shelter in Suffolk County [from] contract[ing] or otherwise engag[ing] in business with any other

municipality (an "external municipality") without the permission or coordination of the County of Suffolk and/or the State of New York for the purpose of providing housing or accommodations for asylum seekers.

(SAC Ex. A-22). The Suffolk Order empowers the County Attorney to "commence actions or proceedings in the name of the County, in a court of competent jurisdiction, to abate any violation, or to enforce any provision . . ." of the Suffolk Order. (*Id*.).

Following the issuance of the Suffolk Order, the Suffolk County Supervisors' Association implored the federal government to "[f]ix the system like we have been asking them to do for years. It should not and cannot be left to local governments to shoulder this burden or take on the responsibility for this issue." (SAC ¶ 343).

Plaintiffs allege that the Suffolk Order violates RRT's constitutional and federal civil rights. (*Id*. ¶ 346).

## PROCEDURAL HISTORY

Plaintiffs commenced this action on May 22, 2023. (ECF No. 1). The same day, Plaintiffs filed a First Amended Complaint. (ECF No. 32). Plaintiffs also filed a Statement of Relatedness to *Deide, et al. v. Day, et al.* on May 22, 2023, (ECF No. 5), and the cases were accepted as related on May 26, 2023. On June 5, 2023, Plaintiffs requested the Court accept certain other matters as related. (ECF No. 103). The Court denied Plaintiffs' request on June 8, 2023. (ECF No. 126).

In a letter dated June 7, 2023, Orangetown requested a premotion conference ahead of its anticipated motion to dismiss. (ECF No. 114). The Court directed the Plaintiffs to respond by June 12, 2023. (ECF No. 110). Plaintiffs requested an extension to respond to this letter on June 8, 2023, (ECF No. 127), which the Court granted until June 22, 2023. (ECF No. 128).

Niagara requested its own premotion conference in anticipation of a motion to dismiss on June 13, 2023. (ECF No. 136). The Court directed Plaintiffs to respond by June 22, 2023. (ECF No. 145). On June 14, 2023, Onondaga requested a premotion conference in anticipation of a motion to dismiss. (ECF No. 148). Similarly, the Court directed Plaintiffs to respond by June 22, 2023. (ECF No. 160).

Saratoga filed premotion letters on June 15, 2023. (ECF Nos. 164, 165). As with the Niagara and Onondaga letters, Plaintiffs were directed to respond by June 22, 2023. (ECF Nos. 171, 172). Sullivan, Broome, Oneida, the County of Allegany, Orange, and Rockland filed their own premotion letters on June 16, 2023. (ECF Nos. 168, 169, 170, 173, 174). The Court directed Plaintiffs to respond by June 22, 2023. (ECF No. 176).

Madison also filed a premotion letter on June 16, 2023. (ECF No. 178). On June 19, 2023, Plaintiffs requested an extension to respond to each of the foregoing letters in a consolidated response. (ECF No. 181). The Court granted Plaintiffs' request on June 20, 2023. (ECF No. 185). Similarly, Newburgh filed a premotion letter on June 23, 2024. (ECF No. 195).

On July 10, 2023, Plaintiffs requested leave to file a Second Amended Complaint. (ECF No. 198). The Court granted Plaintiffs' request on July 13, 2023. (ECF No. 199). The Court further directed Defendants to inform the court on or before August 23, 2023 whether they intended to file an answer to the SAC or if they will seek leave to file a motion to dismiss. (*Id*.). If the latter, the Defendants were directed to file a consolidated motion to dismiss, with all of the parties receiving page limit extensions to their papers. (*Id*.). Plaintiffs filed the SAC on July 13, 2023. (ECF No. 200).

On August 7, 2023, Plaintiffs sought leave to file a preliminary injunction with an extended page limit. (ECF No. 227). The Court granted Plaintiffs leave on August 9, 2023. (ECF No. 228). Plaintiffs filed their motion for preliminary injunction and supporting papers on August 10, 2023. (ECF Nos. 239-47).

Meanwhile, various Defendants submitted letters informing the Court of their intention to file motions to dismiss. (*See* ECF Nos. 226, 250-55, 257, 258, 260, 264). Further, certain Defendants requested extensions to respond to Plaintiffs' motion for preliminary injunction (*see* ECF Nos. 256, 261-63, 269, 271), which this Court granted on August 18, 2023. (ECF No. 276). Also on August 18, 2023, Schuyler informed the Court that it also intended to move to dismiss Plaintiffs' SAC. (ECF No. 277).

Chautauqua, Dutchess, Fulton, Genesee, Greene, Herkimer, Orleans, Oswego, Otsego, Rennsselaer, Schoharie, Tioga, Wyoming, and Poughkeepsie submitted a letter on August 20, 2023 advising the Court of their intent to file a motion to dismiss. (ECF No. 279). Moreover, Dutchess and Poughkeepsie requested an extension to respond to Plaintiffs' motion for preliminary injunction. (*Id.*). Finally, Dutchess and Poughkeepsie also requested leave to submit separate oppositions to Plaintiffs' motion for preliminary injunction. (*Id.*). On August 22, 2023, Onondaga made a similar request to file a separate opposition to Plaintiffs' motion for preliminary injunction. (ECF No. 281).

Onondaga requested leave to file a motion to sever and transfer venue on August 10, 2023. (ECF No. 229). On August 21, 2023, Chautauqua, Genesee, Greene, Herkimer, Orleans, Rensselaer, Fulton, Oswego, Otsego, Schoharie, Tioga, and Wyoming requested leave to file a motion to sever and transfer venue. (ECF No. 280). On August 23 and 24, 2023, respectively, Niagara and Salina filed their own requests to sever and transfer venue.

(ECF Nos. 285, 286). Oneida also requested leave to file a motion to sever and transfer venue on August 24, 2023. (ECF No. 287). Subsequently, on August 28, 2023, Broome also filed a premotion letter in anticipation of a motion to sever and transfer venue. (ECF No. 289). Madison and Saratoga followed shortly thereafter, filing their requests for leave to file motions to sever and transfer on August 31, 2023. (ECF Nos. 292, 293).

The County of Monroe was voluntarily dismissed from this action on August 23, 2023. (ECF No. 283).

On September 1, 2023, the Court issued an order addressing the parties' various letters. (*See* ECF No. 295). Most pertinently, the Court granted various Defendants leave to file a consolidated motion to sever and transfer venue. (*Id*.). Colonie then submitted its own request seeking leave to file a motion to sever and transfer venue on September 13, 2023. (ECF No. 297). On October 5, 2023, Colonie was permitted to join the other Defendants' consolidated motion to sever and transfer, as well as submit additional arguments, separately. (ECF No. 313).

Eventually, the parties filed their respective papers with respect to the Plaintiffs' Motion for Preliminary Injunction, Defendants' Motions to Dismiss, the Severance Defendants'[10] Motion Sever and Transfer Venue. (ECF Nos. 239, 343-86).

The Motion for Preliminary Injunction papers[11] consist of, among others: (1) Plaintiffs' (a) Memorandum of Law in Support of Motion for Preliminary Injunction ("Mem. Supp. PI", ECF No. 240) and (b) Reply Memorandum of Law in Further Support

---

[10] As defined below.

[11] Declarations, affidavits, and the like will be referred to in the following style: "[Name] Decl." and will, where necessary, indicate the precise motion the declaration, affidavit, etc. was made in relation to. For example, "Weisbord Decl." refers to the as opposed to the Declaration of Chelsea Weisbord in Opposition to Motion for Preliminary Injunction, in Support of the Motion to Dismiss Motion to Sever and Change Venue located at ECF No. 371.

of Motion for Preliminary Injunction (ECF No. 382); and (2) Defendants' (a) Joint Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Opp. PI", ECF No. 343); (b) County Supplemental Memorandum of Law in Further Support of Defendants' Motion to Dismiss ("County Supp. Mem.", ECF No. 355) filed by Dutchess, Schuyler, and Onondaga; and (c) the Towns' Supplemental Memorandum of Law in Support of Their Motion to Dismiss and in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Town Supp. Mem.", ECF No. 356) filed by Orangetown, Newburgh, Poughkeepsie, Salina, and Colonie.

The Motion to Dismiss papers consist of, among others, the: (1) Defendants' (a) Joint Memorandum of Law in Support of Joint Motion to Dismiss ("Mem. Supp. MTD", ECF No. 354); (b) County Supp. Mem.; (c) Town Supp. Mem. (e) Reply Memorandum of Law in Further Support of Defendants' joint Motion to Dismiss ("Reply MTD", ECF No. 386); and (2) Plaintiffs' (a) Memorandum of Law in Opposition to Joint Motion to Dismiss ("Opp. MTD", ECF No. 374); (b) Memorandum of Law in Opposition to Counties' Supplemental Memorandum of Law Offered in Further Support of Motion to Dismiss ("Opp. Counties MTD", ECF No. 375); (c) Memorandum of Law in Opposition to Towns' Supplemental Memorandum of Law in Further Support of Motion to Dismiss ("Opp. Towns MTD", ECF No. 376);

The Motion to Sever and Transfer Venue consists of: (1) the Severance Defendants'[12] (a) Joint Memorandum of Law in Support of Motion to Sever and Transfer Venue ("Mem. Supp. Venue", ECF No. 345) and (b) Reply Memorandum of Law in Further Support of Motion to Sever and Transfer Venue (ECF No. 385) and (2) Plaintiffs'

---

[12] As defined below.

Memorandum of Law in Opposition to Motion to Sever and Transfer Venue ("Opp. Venue", ECF No. 377).

## THE INSTANT MOTIONS

Pending before the Court are: (1) Plaintiffs' Motion for Preliminary Injunction; (2) Defendants' Motion to Dismiss on multiple grounds is and inclusive of the County Supp. Mem. and Town Supp. Mem.; and (3) Rensselaer, Herkimer, Oneida, Broome, Genesee, Orleans, Saratoga, Greene, Onondaga, Chautauqua, Fulton, Madison, Niagara, Oswego, Otsego, Schoharie, Schuyler, Suffolk, Tioga, Wyoming, Salina, and Colonie's (the "Severance Defendants") Motion to Sever Claims and Transfer Venue. (ECF Nos. 239, 353, 345).

As a preliminary matter, the Court notes that the Severance Defendants urge resolution of the Motion to Sever Claims and Transfer Venue prior to considering the Defendants' Motions to Dismiss. (See Mem. Supp. S&T pp.3-5). The Court is inclined, however, to first address Defendants' arguments that this Court lacks subject matter jurisdiction to address certain Plaintiffs' specific claims. (*See* Mem. Supp. MTD pp. 4-35); *see also Renois v. WVMF Funding, LLC*, 2024 WL 1313492, at *3 (S.D.N.Y. March 27, 2024) ("'When a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, and also moves to dismiss on other grounds . . . the Court must consider the Rule 12(b)(1) motion first.'"). The Court will also address the County Supp. Mem. and Town Supp. Mem. where necessary and appropriate.

## I.   DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A.  LEGAL STANDARD

Fed. R. Civ. P. 12(b)(1) ("Rule 12(b)(1)") provides in relevant part that a party may move to dismiss for lack of subject matter jurisdiction prior to filing a responsive pleading. "Whether the plaintiff has made out a case or controversy between himself and the defendant . . . is the threshold question in every federal case, determining the power of the court to entertain the suit." *Rankine v. Levi Strauss & Co.*, 674 F. Supp.3d 57, 62 (S.D.N.Y. 2023) (quoting *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012)) (cleaned up). When a court lacks the statutory or constitutional power to adjudicate a case, it should dismiss the case for lack of subject matter jurisdiction under Rule 12(b)(1). *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009), but "the court may resolve [any] disputed jurisdictional fact issues by referring to evidence outside of the pleadings." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). Moreover, a plaintiff must satisfy the standing requirements with respect to each claim asserted. *In re Bibox Grp. Holdings Limited Securities Litigation*, 534 F. Supp.3d 326, 334 (S.D.N.Y. 2021) (quoting *Mahon*, 683 F.3d at 64)).

## B.  DISCUSSION

Defendants assert multiple basis for dismissing Plaintiffs' claims for lack of subject matter jurisdiction. Defendants allege that Plaintiffs have no standing to levy claims against the Non-Hotel Counties. (Mem. Supp. MTD pp.5-19). Similarly, Defendants contend that the Hotel Plaintiffs lack standing to assert direct claims against municipalities in which they are not located and that Plaintiffs, writ large, lack third-party standing to assert claims on behalf of Asylum Refugees. (*Id*. pp.13-19). Defendants also contend that, beyond a lack of standing, any claims against the Non-Hotel Counties are not ripe for judicial review. (*Id*. pp.19-21). Finally, Defendants argue that claims against the Emergency Orders are now moot. (*Id*. pp.21-30).

### i. Whether Plaintiffs Have Standing to Assert Claims Against the Non-Hotel County Defendants & Whether Those Claims Are Ripe

Article III of the Constitution generally requires that a plaintiff "must establish (1) an injury in fact, defined as an invasion of a legally protected interest that is concrete, particularized, and actual or imminent; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge, N.Y.*, 98 F.4th 386, 391 (2d Cir. 2024) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992)). "Standing is the threshold question in every federal case." *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 725 F.3d 65, 105 (2d Cir. 2013) (quoting *Disability Advocates, Inc. v. N.Y. Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 156 (2d Cir. 2012)). Because the ripeness analysis has significant "overlap[] with the standing doctrine," *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 149 (2d Cir. 2021), and "is really just the first *Lujan* factor[; i.e.] a plaintiff's

claim is constitutionally unripe [if] the plaintiff's claimed injury . . . is not actual or imminent, but instead conjectural or hypothetical" the Court will assess Defendants' standing and ripeness arguments simultaneously.[13] *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013)) (internal quotations omitted); *see also Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008) (due to this overlap, claims that were sufficiently "actual and imminent" to establish Article III standing were also sufficiently ripe for adjudication).

Defendants argue that Plaintiffs lack standing to assert claims against the Non-Hotel Counties. (Mem. Supp. MTD pp.6-13). Plaintiffs counter that only RRT "brings claims against . . . the Non-Hotel Counties." (Opp. MTD p.12). Accordingly, the Court will first consider whether RRT has standing to bring claims against the Non-Hotel Counties in its own right.

A plaintiff is required to show standing "with respect to each asserted claim" underpinned by a "distinct and palpable injury to herself." *In re Bibox Holdings Ltd. Securities Litigation*, 534 F. Supp.3d 326, 334 (S.D.N.Y. 2021) (quoting *Mahon v. Ticor Title Ins. Co.,* 583 F.3d 59, 64 (2d Cir. 2012). It is therefore prudent to first identify the claims RRT purports to assert against the Non-Hotel Counties, whether on its own or on behalf of the Asylum Refugees.

Plaintiffs' Second Cause of Action asserts claim under Title II of the Civil Rights Act of 1964 ("Title II"), 42 U.S.C. § 2000a. Title II provides, in relevant part "that [a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities,

---

[13] The Court's decision is reinforced by Defendants' assertion that "[t]he claims against the Non-Hotel County Defendants are unripe for judicial review for the same reason they lack standing . . . ." (Mem. Supp. MTD p.21).

privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin. 42 U.S.C. § 2000a(a). The claim appears to be brought solely by the Hotel Plaintiffs and on behalf of the Asylum Refugees. (*See*, *generally,* SAC ¶¶ 391-402; *see Id*. ¶¶ 394-95 ("Plaintiffs have a right and obligation to provide for the equal use and enjoyment of *their hotels* . . . . Defendants[] . . . violate[d] the rights of both *[Hotel Plaintiffs]* and the *Asylum Refugees* under Title II . . . .") (emphasis added)). The allegations in the Complaint do not lend itself to suggest that the claim is asserted on behalf of RRT. Accordingly, the Court will not address this cause of action with respect to RRT's direct standing.

The Sixth Cause of Action is entirely premised on the Supremacy Clause. U.S.C.A. Const. Art. 6, cl. 2. Plaintiffs allege that the Emergency Orders and selective enforcement of the zoning codes violate the Supremacy Clause and are preempted under federal law. (SAC, p. 97, ¶¶ 436-46). Notably, Plaintiffs omit any mention of preemption when listing the constitutional and statutory bases for RRT's alleged harms. (*See* Opp. MTD pp.16-17 ("RRT's injuries include . . . violations of its federal constitutional rights under Title II, Section 1981, Section 1983, the Contract Clause, and the Fourth, Fifth, and Fourteenth Amendments.")).

It is well settled that the Supremacy Clause is not the source of a federal right. *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 324, 135 S. Ct. 1378, 1383 (2015) citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444 (1989). The Supremacy Clause does, however, instructs the courts what to do when state and federal law conflict or clash, but is silent regarding who may enforce federal laws in court,

and in what circumstances they may do so. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. at 325. More precisely, the Supremacy Clause provides that courts must not give effect to state laws that conflict with federal laws. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. at 324 320, 324 (internal citations omitted). Based on the foregoing, to the extent Plaintiffs attempt to assert a claim on behalf of any of the Plaintiffs based upon an alleged violation of the Supremacy Clause, such claims are deemed dismissed.[14]

Plaintiffs' Seventh Cause of Action seeks equitable and legal relief under Section 1983. (Id. ¶¶ 447-54). Section 1983 is not, itself, a font of substantive rights, but is only the channel by which a plaintiff may vindicate their rights conferred by the "Constitution and federal statutes that it describes." *Beauvoir v. Falco*, 345 F. Supp.3d 350, 362 (S.D.N.Y. 2018) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)) (internal quotations omitted). However, as discussed in more detail below, the Court construes this cause of action as alleging a Section 1983 conspiracy claim and presumes standing for all of the Plaintiffs for purposes of this Opinion & Order.

---

[14] The Court notes that in the operative complaint, Plaintiffs assert that the Defendants through their Executive Orders and their selective prosecution and enforcement of local zoning and building codes denied the Plaintiffs of their statutory and constitutional right to provide temporary public accommodation and violate the U.S. Constitution, the Supremacy Clause, and federal immigration laws and policies. (SAC, ¶¶ 437 -442). The Court perceives Plaintiffs' reference to the Supremacy Clause merely as an attempt to assert a preemption argument.

It is well settled that federal law will preempt state law in three circumstances: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, is typically inferred where the field is one in which federal interest is so dominant that federal system will be assumed to preclude enforcement of state laws on the same subject; and (3) conflict preemption. *In re Jadeco Constr. Corp.*, 606 B.R. 169, 181 (Bankr. E.D.N.Y. 2019) citing *New York SMSA Ltd. Partnership v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). Here, and as later discussed in this opinion, the preemption argument fails. Other than a specific reference to the Supremacy Clause, the Plaintiffs do not identify which U.S. Constitutional provisions and federal immigration laws, regulations or policies are alleged to have been violated. Similarly, Plaintiff fails to reference which local zoning and building codes are purportedly being selectively being prosecuted or enforced. To the extent Plaintiff is attempting to assert a colorable claim concerning the enforcement of local zoning laws and municipal building codes, such claim would fail. As my learned colleague once wrote "there is no federal law prohibiting municipalities from enforcing zoning and building codes…, and the [h]otel does not have a federal right to evade such laws. *Town of Newburgh, New York v. Newburgh EOM LLC*, 712 F. Supp. 3d 473, 481 (S.D.N.Y. 2024).

Finally, Plaintiff's Eighth Cause of Action asserts claims sounding in alleged violations of the Fourth Amendment, unlawful entries into certain hotels without a warrant or probable cause (SAC ¶ 456). The cause of action is expressly directed at the Towns based on expressly asserted harms experienced by a set of Plaintiffs that does not include RRT. (SAC ¶¶ 455-63 ("Certain Defendants, have under color of state law, unlawfully entered and search certain Plaintiffs' hotels . . . . Plaintiffs CWP Syracuse[], [Crossroads], AIMS Newburgh[], [Armoni], AIMS Orangeburg and ES Albany – and their hotel clients, the Asylum Refugees – have suffered traceable harm as a direct result . . . .")). The Court will therefore not address this cause of action with respect to RRT's standing. The Court's analysis is therefore limited to addressing whether RRT has standing to assert Plaintiffs' First, Third, Fourth, and Fifth Causes of Action.

### 1.  Whether RRT Has Direct Standing to Challenge the Non-Hotel Counties & Whether Any of RRT's Claims Are Ripe

On the specific facts alleged in this case, and with particular regard to the unprecedented migrant crisis and response that gave rise to this action, RRT has sufficiently plead a controversy to confer Article III standing with respect to certain Defendants under the First, Fourth, and Fifth Causes of Action—and RRT's claims under those causes of action against those certain entities are ripe. RRT fails, however, to demonstrate direct standing with respect to the Third Cause of Action.

Plaintiff's Third Cause of Action asserts that the Defendants executive orders and selective discriminatory enforcement of zoning codes violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Defendants assert that RRT has not suffered an injury-in-fact, and thus RRT has also failed to establish a causal connection

between alleged injuries and the Non-Hotel Counties' conduct and that the lack of injury precludes any redressability on this Court's part. (Mem. Supp. MTD pp.9-13).

The injury-in-fact requirement requires a plaintiff to show "an invasion of a legally protected interest [that] is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. An injury is "concrete" when it is "real and not abstract", though not necessarily "tangible", and is "particularized" when it affects a plaintiff "in a personal and individual way". *Spokeo v. Robins*, 578 U.S. 330, 339-40 (2016)). The "actual or imminent" requirement demands a "plaintiff . . . show that he has sustained or is immediately in danger of sustaining a direct harm as a result of the challenged conduct." *Melendez v. City of New York*, 668 F. Supp.3d 184, 195 (S.D.N.Y. 2023) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)) (cleaned up).

Plaintiffs assert RRT has experienced four harms: "(1) impermissible interference with its rights to execute, enjoy the benefits of, and achieve the purposes of its contracts[15] with (a) New York City (the "NYC Contract"); and (b) the [Plaintiff] Hotels; (2) its inability to consummate negotiations for agreements with hotels in Non-Hotel Counties; (3) its inability to realize its reasonable investment-backed expectations regarding use of corporate assets and to engage fully in the Asylum Refugee assistance industry; and (4)

---

[15] The Court notes Defendants' assertion that RRT's contract with New York City may not be valid after the City Comptroller did not approve the contract in September 2023. (Mem. Supp. MTD p.9; *see also* Weisbord Decl. Ex. J). Defendants do not, however, ever state outright that the contract is invalid, only that that the "validity of enforcement of that contract is in serious question . . . ." (Mem. Supp. MTD p.9). The Court further notes that multiple New York City official records list a contract with RRT, styled "Asylee Housing Flex/Surge Program for NYS", as "Solicitation Awarded", "Registered", and "In Progress". *See* NYC City Record, https://a856-cityrecord.nyc.gov/RequestDetail/20230918103; *see also*, NYC Passport Public Beta, https://a0333-passportpublic.nyc.gov/contracts.html (search "20248801671" in search field "Contract ID"). As publicly available government records, the Court may, and does, take judicial notice of such documents. *See Natural Resources Defense Council*, 410 F. Supp.3d at 598 (citing *Wells Fargo Bank, N.A.*, 127 F. Supp.3d at 166)). Thus, for purposes of these motions, the Court finds that RRT does have a contract with New York City.

actual, ongoing, and imminent violations of[, in pertinent part,] its federal constitutional rights under . . . Section 1981, . . . the Contract Clause, and the . . . Fifth[] and Fourteenth Amendments."[16] (Opp. MTD pp.16-17). Plaintiffs refine their characterization of RRT's harm as "actual harm (under its contract with New York City)" and as "legitimate pre-enforcement challenges to [the Emergency Orders] in Non-Hotel Counties", with those orders prohibiting and inhibiting RRT's intended conduct in those counties. (*Id*. p.17).

Inconsistency is rife throughout Plaintiffs' Opposition and the SAC, which presents an issue as to the standing analysis: whether Plaintiffs have sufficiently plead the existence of contracts with hotels in Non-Hotel Counties or whether they have only asserted harms on the basis of the NYC Contract. To reiterate and in pertinent part, Plaintiffs' allege harm(s) on the bases of RRT's contract with New York City and its "*inability to consummate*" agreements with hotels in the Non-Hotel Counties, only to later have Plaintiffs define RRT's Contract Clause claims as against "every Defendant with respect to RRT's contract with New York City . . . and . . . each Non-Hotel County in which RRT has *entered* or attempted to enter into an agreement with a hotel for the public accommodation of Asylum Refugees." (*Compare Id.* p. 16 *with Id.* p.51, n.26) (emphasis added). What's more, Plaintiffs' opposition refers to "attempted and intended contracts with hotels situated in certain Non-Hotel Counties" and citing to the SAC. (*Id*. p.52). The SAC's pleadings muddy Plaintiffs' Opposition further, stating that RRT *has reached* "agreements"—but not "contracts"—with hotels located in Non-Hotel Counties. (*See* SAC

---

[16] The Court has already determined which Causes of Action RRT is capable of asserting claims under. *See supra*. To the extent that Plaintiffs' arguments in their Opposition can be construed as RRT asserting new claims, it is axiomatic that consideration of claims raised for the first time in the opposition to a motion to dismiss is improper. *See Zhou v. NextCure, Inc.*, 20-CV-07772-LTS-RWL, 2023 WL 4493541, at *9 (S.D.N.Y. July 12, 2023) ("'[P]laintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments.'") (quoting *Louis v. New York City Hous. Auth.*, 152 F. Supp.3d 143, 158 (S.D.N.Y. 2016)).

¶¶ 173, 181, 191, 201, 208, 216, 227, 272, 282, 292, 301, 311, 319, 328, 336, 345, 353, 362).[17]

On balance, and even though the Plaintiffs' Opposition is not wholly consistent on the matter, the Court construes the Opposition's multiple repudiations of the existence of actual contracts in the SAC, combined with the paucity of facts alleged as to these "agreements" in the SAC, itself, as concessions that RRT does not have nor alleges the existence of binding legal contracts with hotels in the Non-Hotel Counties to house Asylum Refugees but rather only have had preliminary[18] "discussion" or have made attempts to enter into " agreements."[19] The Court will therefore only address whether RRT has standing with respect to the NYC Contract.

Plaintiffs' Third Causes of Action is premised upon the Fourteenth Amendment. (SAC ¶¶ 403-15). Plaintiffs allege that the Fourteenth Amendment grants "due process rights to freely travel and transport Asylum Refugees to places of public accommodation." (*Id*. ¶ 405). Although the right to travel is not expressly protected in the text of the U.S. Constitution, it has long been held a basic right. *Saenz v. Roe*, 526 U.S. 489, 501, 119 S. Ct. 1518, 1525 (1999). The "fundamental right to travel within a state" is well established in the Second Circuit. *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008); Jeffery v. City of New York, No. 20-CV-2843, 2022 WL 204233, at *5 (E.D.N.Y. Jan. 24,

---

[17] The Court notes that, in one instance, Plaintiffs do admit in the SAC only of intent to enter into agreements with hotels in Non-Hotel Counties. (*See, e.g.,* SAC ¶ 237).

[18] The Court also notes the pervasive use of "agreements", rather than "contracts", in the Plaintiffs' affidavits in support of its Motion for Preliminary Injunction. (*See, e.g.,* Bhatt Affidavit, ¶ 2; Fligelman Affidavit, ¶ 2; Kinney Affidavit, ¶ 2; Patel Affidavit, ¶ 3; Ratanji Affidavit, ¶ 2). The Court further notes that none of these affidavits attach copies of these purported "agreements".

[19] In the case of Sullivan County, Plaintiffs note that certain Asylum Refugees are already located in the county. (SAC ¶ 246). Plaintiffs do not, however, assert that *they* transported those Asylum Refugees to Sullivan County and, indeed, later note their "inten[t] to provide transportation thereto under the terms of its existing contract." (*Id*.) Consistent with the foregoing, the Court construes the reference to an "existing contract" to be the NYC Contract.

2022) ("Freedom of movement, which includes the freedom to travel within a state, is a well-established fundamental right"). Laws and policies that burden the fundamental right to free movement within the state are subject to strict scrutiny. *Williams,* 535 F.3d at 75; *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 648 (2d Cir. 1971) (applying strict scrutiny to a five-year residency requirement for municipal public housing because such law affected a "fundamental right" to travel for individuals arriving from outside of the city*); Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (because the curfew in question "limit[ed] the constitutional right to free movement within the [t]own ..., we assume that were this ordinance applied to adults, it would be subject to strict scrutiny.") Because the Non-Hotel County Emergency Orders clearly disrupt the right to travel or as alleged the "right to freely . . . transport Asylum Refugees to places of public accommodation," the Court construes the Third Cause of Action as a pre-enforcement challenge.

Plaintiffs' First and Fourth Causes of Action allege violations of the Contract Clause and Section 1981, respectively, due to interference with Plaintiffs' contractual obligations and performance. (SAC ¶¶ 379-90, 416-23). The Court therefore construes these claims as alleging "actual harm" under the NYC Contract. (Opp. MTD. p.17). Similarly, Plaintiffs' Fifth Cause of Action alleges a taking of property in violation of the Fifth Amendment. (SAC ¶¶ 403-415). Contractual rights can suffice as "property" within the meaning of the Fifth Amendment, *see Elmsford Apartment Associates, LLC v. Cuomo*, 469 F. Supp.3d 148, 162-68 (S.D.N.Y. 2020) (analyzing a Fifth Amendment claim raising a Fifth Amendment challenge to a New York State emergency order based upon a

"contractual right to collect rent . . ."), and the Court will accordingly consider the Third

Cause of Action as claiming "actual harm" under the NYC Contract. (Opp. MTD. p.17).

The Court will first address RRT's standing with respect to its pre-enforcement

challenges under the Third Cause of Action before considering whether RRT has standing

under the First, Fourth, and Fifth Causes of Action.

> **a. Whether RRT Has Standing to Assert a Pre-Enforcement Challenge to the Non-Hotel County Emergency Orders Under the Third Cause of Action**

A pre-enforcement challenge to the constitutionality of a statute providing for

criminal penalties is cognizable and does not require a plaintiff "expose herself to liability

to challenge." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023). Statutes

that provide for the possibility of civil suit, without criminal penalties, are also cognizable.

*Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). Pre-

enforcement challenges require a plaintiff to show: "(1) an intention to engage in a course

of conduct arguably affected with a constitutional interest; (2) that the intended conduct is

proscribed by the challenged law; and (3) that there exists a credible threat of prosecution

thereunder." *Vitagliano*, 71 F.4th at 136 (quoting *Susan B. Anthony List v. Driehaus*, 573

U.S. 149, 159 (2014)) (cleaned up).

Here, the majority of the Non-Hotel County Emergency Orders provide for Class

B Misdemeanors as punishment[20] and the rest authorize county authorities to initiate court

actions to enforce said orders[21]—with one exception, the Sullivan Order. (*See* Sullivan

Order). Because the Sullivan Order provides for neither criminal penalties nor the threat of

---

[20] *See* SAC Exs. A-5 – 7, A-9 – 10, A-14 – 17, A-19, A-21, A-23 – 24.
[21] *See* SAC Exs. A-4, A-8, A-11, A-22; Oswego Order.

civil prosecution, a pre-enforcement challenge to the Sullivan Order is not cognizable and the Third Cause of Action as alleged by RRT against Sullivan is deemed DISMISSED. *See Vitagliano*, 71 F.4th at 136; *Vermont Right to Life Committee, Inc.*, 221 F.3d at 136. The remaining Non-Hotel County Emergency Orders are cognizable, and the Court will proceed with the analysis.

Under the Third Cause of Action, RRT has not alleged a direct "course of conduct arguably affected with a constitutional interest . . . ." *Vitagliano*, 71 F.4th at 136. RRT couches this claim as a violation of its "due process right[] to freely travel and transport the Asylum Refugees to as place of public accommodation."[22] (SAC ¶ 405). Though not explicitly mentioned in the text of the U.S. Constitution, the courts have held that the "[f]reedom to travel throughout the United States has long been recognized as a basic [fundamental] right See, *Page v. Cuomo*, 478 F. Supp. 3d 355, 362 (N.D.N.Y. 2020) citing *United States v. Guest*, 383 U.S. 745, 758, 86 S.Ct. 1170 (1966).

The Court has found no case law suggesting the Fourteenth Amendment's protections encompass any "right to transport". A free floating, unsubstantiated "right to transport" is not a basis for direct standing, and to the extent RRT has a claim under the Third Cause of Action it would have to be raised via third-party standing on behalf of the Asylum Refugees. Moreover, nothing in the Non-Hotel County Emergency Orders

---

[22] Plaintiffs' also assert an Equal Protection Claim in the Third Cause of Action based on the "right to provide public accommodations . . . ." (SAC ¶ 406). The SAC is clear and cannot be interpreted to mean that RRT is a provider of public accommodation. RRT delineates its responsibilities under the NYC Contract as a providing a suite of services which include transportation to and from the hotels, and primarily identifying and engaging hotels throughout the state for the purpose of providing temporary housing accommodations. (SAC ¶¶ 11-13). The gist of RRT's allegations is that they arrange for multiple services to be provided to the Asylum Refugees, inclusive of food, transportation and housing. As such, the Court will not consider the Equal Protection claim with respect to RRT.

prevents RRT from traveling to said counties; instead, they prohibit the travel of the Asylum Refugees, themselves. Accordingly, RRT's pre-enforcement challenge under the Third Cause of Action against the Non-Hotel Counties is DISMISSED for lack of standing.

### b. Whether RRT Has Standing to Assert Under the First, Fourth, and Fifth Causes of Action

RRT has sufficiently asserted standing under the First, Fourth, and Fifth Causes of Action under the specific facts of this action and those claims are ripe.

As discussed above, each of the First, Fourth, and Fifth Causes of Action are predicated on harm(s) flowing from the NYC Contract. Plaintiffs state that the Non-Hotel County Emergency Orders "caused RRT actual harm by prohibiting and making illegal its contractual performance with New York City . . . ." (Pl. Opp. MTD p. 18). Plaintiffs cite to no cases to support their proposition. (*See generally Id.*). One obvious concern with such a proposition is that it would serve to permanently place private parties' contractual rights above a government's ability to legislate and regulate. And, indeed, Plaintiffs overstate the alleged harm experienced by RRT under the NYC Contract: RRT's obligations are not illegal, full stop. Rather, they are more difficult to perform, as RRT is now required to seek accommodations for Asylum Refugees in New York counties other than the Non-Hotel Counties.

Even so, the interference the Non-Hotel County Emergency Orders inflict on RRT's obligations under the NYC Contract is sufficient to make out a concrete and particularized harm. This is not an instance of a government issuing a general regulation, but rather a targeted one: each of the Non-Hotel County Emergency Orders, to varying degrees, specifically reference the ongoing immigration crisis and/or the Humanitarian Program. When a regulation is pointed so specifically, those whose contractual obligations

become more difficult to perform because of the regulation have suffered a sufficient harm to make out Article III standing.

For completeness, RRT's harms are fairly traceable to the Non-Hotel County Emergency Orders: absent those orders, RRT would be able to perform its obligations under the NYC Contract as intended. Moreover, RRT's harm is redressable, as an injunction, requested in each of the relevant causes of action, (*see* SAC ¶¶ 389, 422, 434), staying enforcement of the Non-Hotel County Emergency Orders would eliminate the increased burden on RRT in performing its obligations under the NYC Contract. Finally, RRT's claims are ripe as RRT's harm crystallized when the Non-Hotel County Emergency Orders went into effect.

As such, Defendants' motion to dismiss all claims against the Non-Hotel Counties for lack of subject matter jurisdiction is GRANTED, in part, and DENIED, in part.

### ii. Whether Plaintiffs Have Third-Party Standing to Assert Claims on Behalf of Asylum Refugees

Defendants argue that none of the Plaintiffs have third-party standing to assert claims on behalf of the Asylum Refugees. (Mem. Supp. MTD pp.13-19). Plaintiffs state they assert claims on the Asylum Refugees' behalf under Title II, Section 1981, and the Fourteenth Amendment, i.e. under the First, Second, and Third Causes of Action. (Opp. MTD p. 23).

The third-party standing rule, a rule of prudential standing, prevents "litigants from asserting the rights or legal interests of others simply to obtain relief from injury to themselves." *New York State Citizens' Coalition for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015)) (cleaned up). In the Second Circuit, a plaintiff can evade the third-party standing rule by

showing: (1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests. *Id*. (internal quotations omitted). Prior to addressing the third-party standing rule, however, "the party bringing suit must establish constitutional standing in its own right." *Mental Hygiene Legal Service v. Cuomo*, 13 F. Supp.3d 289, 298 (S.D.N.Y. 2014).

Defendants briefly argue that none of the Plaintiffs have established an injury-in-fact sufficient to make out Article III standing, relying on its prior arguments as to RRT's direct standing and contending that to the extent that the Hotel Plaintiffs have a business-customer relationship, such relationship would be with one of New York City or RRT and not with the Asylum Refugees. (Mem. Supp. MTD pp.15-16). Because the Court finds that all the Plaintiffs cannot establish third-party standing on other grounds, the Court will not address these arguments.

Plaintiffs have failed to make out third-party standing to assert claims on behalf of the Asylum Refugees. More specifically, Plaintiffs have failed to show that there is "some hindrance to the [Asylum Refugees'] ability to protect [their] own interests." *Justin v. Tingling*, 2024 WL 246021, at *6 (S.D.N.Y. Jan. 23, 2024) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)) (internal quotations omitted). As pointed out by Defendants, certain Asylum Refugees have asserted their rights in another matter before this Court with respect to the Rockland and Orange Orders, *Deide, et al. v. Day, et al.*, 23-cv-3954 (NSR). (*See also* Mem. Supp. MTD p.18). Those plaintiff Asylum Refugees also filed a motion for class certification that, had it been granted, would encompass all the Asylum Refugees. (*See Deide v. Day*, No. 23-cv-3954 (NSR), 2024 WL 3471294 (S.D.N.Y. July 19, 2024); *see also* Mem. Supp. MTD p.18). And, even though that motion was denied, the very

existence of the *Deide, et al. v. Day, et al.* action is proof enough the Asylum Refugees can assert their own rights.

The sum of Plaintiffs' argument that the Asylum Refugees are hindered from asserting their rights is that "[c]ourts readily find 'some hindrance' where the third parties . . . belong to a traditionally disenfranchised group." (Opp. MTD p.25). One's membership in a "traditionally disenfranchised group" is not sufficient alone to state a hindrance. Plaintiffs' opposition and the SAC do not otherwise allege any hindrances faced by the Asylum Refugees.

Plaintiffs rely on two cases to show the Asylum Refugees do face a hindrance, each of which is non-binding on this Court and inapt. (Opp. MTD pp.25-26). The first stands for the proposition that when certain minority immigrant groups will "face hostility from the residents of [their town]" should they bring suit in their own name, they are hindered from initiating an action. *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1044 (11th Cir. 2008). For one, the very foundational premise of this action is that Plaintiffs are prevented from transporting or housing Asylum Refugees in the Counties, leading to the unavoidable conclusion that the Asylum Refugees whose rights Plaintiffs seek to vindicate are not yet present in the counties. The Court is also skeptical that a third-party asserting the rights of Asylum Refugees would diminish any hostility the Asylum Refugees would face, in general, and particularly in this case given the speed with which multiple Counties acted in issuing their Emergency Orders and the fact that those Emergency Orders are explicit in targeting Asylum Refugees. In Plaintiffs' second case, the court found a hindrance when Syrian refugees would: (1) prefer to "lay-low" and not draw attention to themselves and (2) be reticent to initiate an action against the state's governor who had

announced a policy suspending the settlement of refugees in the state. *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp.3d 718, 732 (N.D. Ind. 2016). The Court is again skeptical that a third-party bringing suit would diminish attention and scrutiny on refugees. Further, presuming the *Exodus Refugee* court was concerned about potential retaliation by governmental actors if refugees brought suit, there is no guarantee that the resettlement agency bringing suit would immunize the refugees, generally, from any such retaliation. In other words, the filing of the suit, not the named plaintiff, would be the most prevalent factor in provoking a response.

In any event, the existence of *Deide, et al. v. Day, et al.* is sufficient to demonstrate the Asylum Refugees are not hindered in asserting their own rights. Plaintiffs attempt to argue they "are uniquely situated to vindicate the rights" of Asylum Refugees in challenging the Emergency Orders from Counties other than Rockland and Orange, whose orders are challenged in *Deide*. Not so. The case law cited by Plaintiffs is not binding in this District and the Court opts not to adopt its reasoning. The Asylum Refugees are just as capable of asserting claims against the non-Rockland or Orange Counties as were against those counties in *Deide*. That the New York Civil Liberties Union focused on Rockland and Orange in *Deide* does not amount to a hindrance in asserting claims against, say, Sullivan or Saratoga. It was a choice made by the parties in that action. The Asylum Refugees face no greater hindrance in asserting claims directly themselves against the other Counties than any litigant would face in bringing any action, most notably acquiring representation. Accordingly, the Plaintiffs lack third-party standing to assert claims against the Defendants on behalf of Asylum Refugees.

### iii.  Whether Plaintiffs Claims Against the Emergency Orders Are Moot

Defendants argue that Plaintiffs' claims against the Emergency Orders are moot because those initial Emergency Orders have expired. (Mem. Supp. MTD pp.21-30).

"A party seeking to have a case dismissed as moot bears a heavy burden." *Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005) (citing *United States v. W.T. Grant Go.*, 345 U.S. 629, 633 (1953)); *see also Marin v. Town of Southeast*, 136 F. Supp. 3d 548, 561 (S.D.N.Y. 2015). For the entirety of its pendency, a "dispute before the court must be real and live, not feigned, academic, or conjectural." *Wagschal v. Skoufis*, 442 F. Supp.3d 612, 620 (S.D.N.Y. 2020) (quoting *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001)) (internal quotations omitted). "When issues in dispute between the parties are no longer live, a case becomes moot." *Id.* (quoting *Lillbask*, 397 F.3d at 84) (cleaned up). An issue is no longer live when it is "absolutely certain that the allegedly wrongful behavior could not reasonably be expected to recur . . . ." *Borough of Upper Saddle River, N.J. v. Rockland County Sewer Dist. #1*, 16 F. Supp. 3d 294, 325 (S.D.N.Y. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 428 U.S. 167, 189 (2000)) (cleaned up). In other words, a defendant must prove "no reasonable expectation remains it will return to its old ways"—which is a "formidable burden". *Federal Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (cleaned up).

There is also an exception to mootness when the challenged action is "capable of repetition, yet evade[s] review." *Lillbask,* 397 F.3d at 84-85 (quoting *Murphy v. Hunt*, 455 U.S. 478 (1982)) (internal quotations omitted). This exception is only applicable in "exceptional situations" when "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration and (2) there is a reasonable expectation

that the same complaining party would be subjected to the same action again." *Id.* (cleaned up).

Further, "the amendment or repeal [or lapse] of an allegedly unconstitutional . . . provision will not necessarily moot litigation already underway; however, . . . deference to the [governmental] body's decision to amend is the rule, not the exception." *Lamar Advertising of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 377 (2d Cir. 2004) (citing *Harrison & Burrowes Bridge Constructors*, 981 F.2d 50, 61 (2d Cir. 1992)). Claims will survive when the "amendments are merely superficial or the law, after amendment, suffers from similar infirmities as it did at the outset." *Id.* at 378 (citing *Northeastern Fla. Chap. Of the Associated Gen. Contractors of America v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993)). However, when a "defendant's conduct has been sufficiently altered so as to present a substantially different controversy from the one that existed when suit was filed," the challenge to the original conduct is moot. *See Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (citation omitted).

Defendants contend that the Emergency Orders were either allowed to lapse or were replaced by "substantially different" orders than the (Emergency Orders) initially contested. (Mem. Supp. MTD p.24). More specifically, Defendants contend that Counties who issued replacement orders without reference to "asylum seekers" have, essentially, cured any potential defects contained in those initial Emergency Orders. (*Id.* p.26). Defendants also state it cannot be reasonably expected that initially contested Emergency Orders will be reinstated because "[a] series of state court injunctions" bar New York City and certain Plaintiffs from transporting Asylum Refugees to certain of the Counties. (*Id.*

p.25). Finally, Defendants argue Plaintiff's proper remedy is to challenge the now *existing* emergency orders, rather than the Emergency Orders issued in May 2023. (*Id*. p.27).

The Court notes at the outset that each of the Emergency Orders, by their respective terms, would have expired, if not prior to the filing of the SAC on July 13, 2023, then very shortly thereafter. (*See generally* SAC Exs. A-1 – A-26; Chautauqua Order; Owego Order). Defendants specifically state that Herkimer,[23] Otsego,[24] Orleans,[25] Broome,[26] Madison,[27] and Schuyler[28] all allowed their respective Emergency Orders to expire and were not replaced. (Mem. Supp. MTD p.28). Given the record indicates each of these Emergency Orders lapsed and were not replaced in any fashion, there can be no "reasonable expectation" at this juncture, over a year since their issuance, they will be reinstated. As such, all claims against Herkimer, Otsego, Orleans, Broome, Madison, and Schuyler are MOOT. Herkimer, Otsego, Orleans, Broome, Madison, and Schuyler are hereby DISMISSED from this action.

Defendants note additional counties that issued altered, replacement emergency orders, and have provided the revised orders issued by Orange,[29] Rockland,[30] Onondaga,[31] Saratoga,[32] Genesee,[33] Greene,[34] Oswego,[35] and Wyoming.[36] (Mem. Supp. MTD pp.24-

---

[23] *See* Weisbord Decl., Affidavit of Vincent Bono ¶¶ 4-5.
[24] *See Id.*, Affidavit of David Bliss ¶¶ 4-5.
[25] *See Id.*, Affidavit of Lynne M. Johnson ¶¶ 4-5.
[26] Defendants do not provide a cite for Broome. (*See* Mem. Supp. MTD p.29). However, by its terms, the Broome Order automatically expires five days after issuance, unless modified or extended. (*See* SAC, Ex. A-7).
[27] *See* Becker Decl. ¶ 4.
[28] *See* Sauter Decl. ¶¶ 4-6.
[29] *See* Chen MTD Decl., Ex. A.
[30] *See Id.* Ex. B.
[31] Sickinger Decl., Ex. J
[32] Kusnierz Decl. Ex. 1.
[33] Weisbord Decl., Ex. K.
[34] *Id.*, Ex. L.
[35] *Id.*, Ex. M.
[36] *Id.*, Ex. N.

26, n.13). The Court will draw the inference that, because these orders have been revised in an attempt to cure any alleged constitutional deficiencies, they remain in effect. Each of those orders, generally, permits the transportation of individuals to places of public accommodation in each respective County so long as they comply with pertinent law. The relevant orders rely on one of six differing approaches: requiring compliance with: (1) "Social Services Law § 62 and related Administrative Directives of the New York State Office of Temporary and Disability Assistance" (*see* Chen Decl. Ex. A; (2) "all applicable statutes, laws, regulations, and rules of the United States of America, New York State, or the County of Rockland and any affected municipality . . . including but not limited to NYS Social Services Law Art. 2-A and Art. 3 Titles 1 and 2" (*see Id.*, Ex. B; *see also* Sickinger Decl., Ex. J (same but pertinent to Onondaga); Sickinger Decl., Ex. 1 (same but pertinent to Saratoga); or the approval of an emergency housing plan by the relevant County (3) whose approval is "contingent on the proper procedures being duly carried out by district pursuant to New York Code of Rules and Regulations, and as directed by New York State Office of Temporary and Disability Assistance policies cited in 06-ADM-07" (*see* Weisbord Decl., Ex. K); (4) whose approval is contingent upon, among other things, "all applicable provisions and/or procedures of the New York State Office of Temporary and Disability Assistance . . . rules and/or Regulations, New York State Social Services Law[,] New York Codes, rules and Regulations related to the relocation and/or housing and/or assistance of any and all person(s) in need of such assistance, including but not limited to: 18NYCRR 491.2(f); 18NYCRR 900.2(e); SSL§62; OTDA 06-ADM-07; OTDA 20-ADM-09; OTDA Desk Guide LDSS 4731; 18NYCrr 352.35(g)" (*see* Weisbord Decl., Ex. L); (5) whose approval is contingent, upon other things, "the facility where these individuals are

temporarily sheltered is otherwise lawful and in full compliance with applicable NYS Uniform Fire and Building Codes as well as NYS Sanitary Code, Part 7 and other state regulations" (*see Id.*, Ex. M); or (6) with express written approval by Wyoming. (*See Id.*, Ex. N).

Those Counties that have taken one of the first five approaches have made a sufficient showing such that claims against their initial Emergency Orders are moot. As previously set forth, each no longer discriminates on the basis of national origin or immigration status. Rather, those counties will, in fact, accept the transport of individuals, including Asylum Refugees, to their jurisdictions contingent upon either at least compliance with relevant law and, in certain instances, the submission of an emergency housing plan to the relevant County. To the extent that there remains a controversy with respect to these revised orders, it is a "substantially different controversy from the one that existed when suit was filed . . . ." *Am. Freedom Def.* Initiative, 815 F.3d at 109. It is true that certain renewals of the state of emergency accompanying these orders do reference either the initial emergency declarations, which expressly reference immigrants and Asylum Refugees, or, in some instances, expressly refer to immigrants and "asylum seekers", themselves. (*See, e.g.,* Chen Decl., Ex. B (referencing Rockland's initial May 6, 2023 declaration of a state of emergency); Kusnierz Decl., Ex. 1 (referencing Saratoga's declaration of a state of emergency in response to "the immediate danger of an extraordinary increase in the number of asylum seekers entering [Saratoga]")). Even so, to the extent these revised orders present an alleged harm, that harm flows from the operative orders, themselves, and not the declarations of states of emergency. The Court's focus must then be on the revised orders and not from the declarations of states of emergency.

Accordingly, Plaintiff's claims against Orange, Rockland, Onondaga, Saratoga, Genesee, Greene, and Oswego Orders are MOOT. Saratoga, Genesee, Greene, and Oswego are hereby DISMISSED from this action.

Plaintiffs' claims against Wyoming, however, are not moot. The only change Wyoming has made is to broaden its prohibitions to all individuals "including but not limited to migrants or asylum seekers" rather than just "migrants or asylum seekers". (*Compare* Weisbord Decl, Ex. N *with* SAC Ex. A-24). While more inclusive, Wyoming is again specifically targeting and discriminating against migrants and the Asylum Refugees. The Court is unpersuaded by this minor change, as it fails, by its very terms, to present a "substantially different" controversy. *Am. Freedom Def.* Initiative, 815 F.3d at 109. It is obvious that Wyoming is specifically concerned about Asylum Refugees above others. As such, Plaintiffs maintain a live case against Wyoming.

The remaining Counties are: Chautauqua, Dutchess, Fulton, Niagara, Oneida, Rensselaer, Schoharie, Suffolk, Sullivan, and Tioga (the "Remaining Counties"). Defendants do not make specific arguments with respect to any of the Remaining Counties. (*See* Mem. Supp. MTD pp.23-30). Nor, it must be said, do Plaintiffs. (*See* Opp. MTD pp.6-7, 20-23). The Court reiterates that each of the Remaining Counties' Emergency Orders would have, by their express terms, expired well before the filing of the SAC. (*See* SAC Exs. A-4, A-6, A-14, A-12, A-15, A-17 A-20, A-22, A-23, A-26; Weisbord Decl. Ex. O). In their opposition, Plaintiffs only refer to the "purported expiration" of the various Emergency Orders. (Opp. MTD p.6). Later, Plaintiffs seem to concede that certain of the Emergency Orders have been "allow[ed] to lapse . . . ." (*Id*. p.22). Without evidence in the record to the contrary, the Court presumes, based on their express terms, that the Remaining

Counties' Emergency Orders have also lapsed and not been replaced. Although on a motion to dismiss all reasonable inferences must be drawn in favor of the non-moving party, *see Costin v. Glen Falls Hospital*, 103 F.4th 946, 952 (2d Cir. 2024), it is not a reasonable inference to ascribe conduct to a party which Plaintiffs fail to allege occurred at all, let alone provide evidence for the Court's consideration.

Indeed, Plaintiffs rely solely on a two-pronged argument that their claims against the Emergency Orders are not moot. First, Plaintiffs broadly state that "so long as Defendants' preclude Plaintiffs' public accommodation of Asylum Refugees" their claims remain live. (*Id.*). Plaintiffs also note that "<u>no Defendant</u> has ceased prosecuting" the various state court proceedings brought by certain of the named Defendants in this matter. (*Id.*) (emphasis in original). Beginning with the latter, those proceedings are of no moment. None of the Orangetown Action,[37] Rockland Action,[38] Newburgh Action,[39] Poughkeepsie Action,[40] or Salina Action[41] are premised upon any Emergency Order. Only the Orange Action, Orange Petition,[42] Dutchess Petition,[43] Onondaga Action,[44] and Colonie Action[45] expressly rely on an Emergency Order as a legal basis for seeking relief. However, as the Court has already found, each of the original Orange, Dutchess, Onondaga, and Albany Orders have lapsed. Given that fact, any existing prohibition or bar on the transporting of

---

[37] Seeking declaratory relief under Town of Orangetown Code. (SAC, Ex. D).
[38] Alleging the respondents exceeded their legal authority under CPLR § 7803(3) and seeking declaring declaratory and injunctive relief under CPLR § 6301, *et seq.* (SAC Ex. F).
[39] Seeking declaratory relief under Town of Newburgh Building Construction Code and Town of Newburgh Municipal Code. (SAC Ex. E).
[40] Seeking relief under New York Town Law § 135(1) and Town Law § 268. (SAC Ex. I).
[41] Alleging violations of the Salina Town Code and seeking injunctive relief pursuant to violations of local zoning regulations. (SAC Ex. K).
[42] Along with the Orange Action, the Orange Order (SAC Ex. G).
[43] The Dutchess Order. (SAC Ex. H).
[44] The Onondaga Order. (SAC Ex. J).
[45] The Albany Order. (SAC Ex. M).

Asylum Refugees to Orange flows not from the lapsed Orange Order but from the state court ordered TROs issued in the Orange Action, Orange Petition, Dutchess Petition, Onondaga Action, and Colonie Action, respectively (*see Id.* ¶ 151), or from more permanent injunctive relief that may have been ordered in those matters. Defendants only raise mootness arguments with respect to the Emergency Orders. (*See* Mem. Supp. MTD pp.21-30). Plaintiffs' argument with respect to the state court proceedings is therefore unpersuasive. Plaintiffs otherwise do not provide any other basis under which the Counties are seeking to prohibit the transport of Asylum Refugees. The Court has already found, with one exception, that most of the Emergency Orders have lapsed and others have been revised such that the transportation of Asylum Refugees is permissible so long as it is done so in compliance with pertinent existing law. As such, Plaintiffs' argument that the Asylum Refugees remain barred from entering the relevant Counties because of the Emergency Orders is similarly unavailing.

Plaintiffs also attempt to argue that because they have requested nominal damages pursuant to Section 1983, their claims are not moot. (MTD Opp. p.23). Plaintiffs rely on *Sugarman v. Village of Chester* for the proposition that so long as a plaintiff seeks nominal damages in a Section 1983 claim, it will not be rendered moot. *Sugarman*, 192 F. Supp. 2d 282, 290-91 (S.D.N.Y. 2002). Plaintiffs' reliance on *Sugarman* is misplaced, with the case prominently cited therein, *Van Wie v. Pataki*, undermining their position. *Id.* In *Van Wie*, the Second Circuit suggested that the "plaintiffs in *election cases* could avoid the potential for mootness by simply expressly pleading that . . . nominal money damages are requested." *Van Wie*, 267 F.3d 109, 115, n.4 (2d Cir. 2001) (emphasis added). To the extent that this reasoning has been adopted, it has been solely in the context of election-related

litigation. *See generally Farquharson v. Lafayette*, No. 19-cv-3446 (NSR), 2020 WL 1699985, at *1-15 (S.D.N.Y. Apr. 7, 2020) (Plaintiff alleging that defendants denied her an opportunity to run for mayor); *Soleil v. State of N.Y.*, 2005 WL 662682, at *5 (E.D.N.Y. March 22, 2005) (Plaintiff alleging his rights were violated when his petition to be listed on a primary ballot was denied for lack of the legally required amount of signatures). Indeed, the only case outside the realm of election litigation to cite *Sugarman* for the proposition that a request for nominal damages is sufficient to sustain a Section 1983 claim does so superfluously. *See Coe v. Town of Blooming Grove*, 567 F. Supp. 2d 543, 557 (S.D.N.Y. 2008), *aff'd in part, vacated in part, and remanded by* 429 Fed. App'x 55 (2d Cir. 2011) (summary order) (noting that, in addition to nominal damages, the plaintiff had requested compensatory damages). That this line of case law developed in the context of election-related litigation wherein the plaintiff sought to stand in the election is not surprising: without it, a party could engage in delay tactics until after the election has been held, immediately rendering the action moot and leaving the plaintiff harmed and without recourse. The facts here are far removed from such a scenario. Defendants either allowed their Emergency Orders to lapse, removing any alleged harm flowing from the Emergency Orders, or issued revised orders that, with the exception of Wyoming's, presented a "qualitatively different" controversy that Plaintiffs may challenge in an amended complaint. *Lamar*, 356 F.3d at 378, n.17. Given its narrow, precise scope, the Court declines to extend *Sugarman* beyond its purview of election litigation to the matter at hand.

In sum, Plaintiffs' claims against, or premised upon, the Broome, Chautauqua, Dutchess, Fulton, Genesee, Greene, Herkimer, Madison, Niagara, Oneida, Onondaga, Orange, Orleans, Oswego, Otsego, Rensselaer, Rockland, Saratoga, Schoharie, Schuyler,

Suffolk, Sullivan, and Tioga Emergency Orders are DISMISSED as MOOT. Further, as the only claims against the following Counties were based on their respective Emergency Orders, Broome, Chautauqua, Fulton, Genesee, Greene, Herkimer, Madison, Niagara, Oneida, Orleans, Oswego, Otsego, Rensselaer, Saratoga, Schoharie, Schuyler, Suffolk, Sullivan, and Tioga are DISMISSED from this action. Plaintiffs' claims against the Wyoming Order, however, remain cognizable and live.

Before proceeding to certain of the Severance Defendants' Motion to Sever Claims and Transfer Venue, it is prudent to briefly delineate the claims remaining in this matter. The remaining claims basically fall into three categories.[46] The majority of causes of action assert the same two theories: (1) that the Emergency Orders, themselves, are violative of constitutional and federal statutory rights and (2) that certain Defendants engaged in selective, discriminatory prosecution and enforcement of local laws and therefore violated the relevant constitutional provisions and statutes. (*See* SAC ¶¶ 384, 395, 407-08, 420, 427-28, 441, 450). The final category of claims is Plaintiffs' Section 1983 conspiracy claim against all of the defendants.

The Court has already held that the only Emergency Order that presents a live controversy is the Wyoming Order. As laid out in FACTUAL BACKGROUND, Section I, *supra*, none of the Hotel Plaintiffs are located in Wyoming and would therefore not be affected by the Wyoming Order. Thus, the only Plaintiff that can assert a claim challenging the Wyoming Order is RRT.

---

[46] Plaintiffs' Eighth Cause of Action specifically alleges violations of CWP Syracuse, Crossroads, Armoni, AIMS Orangeburg, AIMS Newnburgh, and ES Albany's Fourth Amendment rights by Salina, Onondaga, Newburgh, Orange, Rockland, Orangetown, and Colonie. (*See* SAC ¶¶ 455-463).

With respect to Plaintiffs' second theory, Plaintiffs allege "selective and discriminatory" or "selective and pretextual" enforcement actions taken by Rockland, Orangetown, Orange, Newburgh, Dutchess, Poughkeepsie, Onondaga, Salina, and Colonie. (SAC ¶¶ 138-39, 141, 152, 153, 161-62, 164, 260, 262, 375). The subjects of those alleged discriminatory enforcement actions were: (1) Armoni and RRT, with respect to the Orangetown Action and Rockland Action (SAC Exs. D, F); (2) Crossroads, Ramada, AIMS Newburgh, AIMS Orangeburg, and RRT with respect to the Orange Petition; (3) Crossroads and Ramada, with respect to the Orange Action (SAC Ex. G); (3) Crossroads and RRT, with respect to the Newburgh Action (SAC Ex. E); (4) Route 9, Sai Ram, and RRT with respect to the Dutchess Petition (SAC Ex. H); (5) South Road, Hudson Conference, Patel, and RRT with respect to the Poughkeepsie Action (SAC Ex. I); (6) CWP Syracuse and RRT, with respect to the Onondaga Action and the Salina Action (SAC Exs. J, K); and (7) ES Albany and RRT, with respect to the Colonie Action (SAC Ex. M). Accordingly, only those Plaintiffs subject to a state court enforcement action have claims against the Defendants who commenced said actions.

Finally, the Court must briefly address what Plaintiffs have labeled the "central allegation" of the SAC: that the Defendants engaged in an unlawful "conspiracy[y] to prevent, [that has] prevented, and continue[s] to prevent Plaintiffs from accommodating Asylum Refugees . . . ." (Opp. MTD p.21). Defendants note, correctly, that Plaintiffs barely mention "conspiracy" in the SAC and that none of Plaintiffs' claims expressly sound in conspiracy. (Reply MTD p.15). Still, Plaintiffs do use the word "conspiracy", or some form thereof, in the SAC. (*See* SAC ¶¶ 27, 154, 171, 198, 258). In another instance, Plaintiffs allege that the Counties and Towns worked "hand in hand" to deny Plaintiffs their rights.

(*Id.* ¶ 15). Considering each of these statements is incorporated by reference into Plaintiffs' Seventh Cause of Action, which the Court construes as the relevant cause of action (*see* SAC ¶¶ 447-54), the Court is satisfied that, despite how thin the allegations are, they have put the Defendants on sufficient notice that they are asserting a Section 1983 conspiracy claim, the merits of which the Court will analyze below.[47] Accordingly, all of the Defendants also face a claim alleging a Section 1983 conspiracy.

## II.    The Severance Defendants' Motion to Sever and Transfer Venue

Before addressing Defendants' abstention arguments, the Court will first consider the Severance Defendants' Motion to Sever Claims and Transfer Venue. (*See* ECF No. 345). The only remaining Severance Defendants with live claims against them are Onondaga, Salina, and Colonie for alleged "selective and discriminatory" enforcement actions.

Preliminarily, the Court notes that "[a] motion to dismiss based on [an] abstention doctrine is . . . considered as a motion made pursuant to [Rule] 12(b)(1)." *DeMaria v. New York State Unified Court System*, 23 Civ. 3627 (PAE), 2024 WL 1076543, at *3 (S.D.N.Y. March 12, 2024). As such, there is some authority for abstention arguments to be heard prior to a motion to transfer venue. *See, e.g., Renois*, 2024 WL 1313492, at *3-*8. This approach is not, however, universal. *See, e.g., Bright Kids NYC, Inc. v. QuarterSpot, Inc.*, 1:20-cv-9172 (MKV), 2021 WL 4267637, at *1-*7 (analyzing the propriety of venue before addressing abstention arguments); *Wendell Terrace Apts. v. Scruggs-Leftwich*, 588 F. Supp. 839 (E.D.N.Y. 1984) (same); *see also Reliability Incorporated v. Doki*, 20 Civ.

---

[47] Too boldly, however, Plaintiffs also argue that they have plead a claim for conspiracy under 42 U.S.C. § 1985 despite not once mentioning the statute. (*Compare* Opp. MTD p.74, n.43 *with, generally,* SAC). The Court therefore finds that Plaintiffs are improperly attempting to raise a new Section 1985 conspiracy claim in their opposition, which they plainly cannot do.

7109 (KPF), 2021 WL 3408589, at *8-*11 (performing an abstention analysis when considering whether venue is proper). Further, "[w]here district courts are presented with both a motion to dismiss, under [Rule] 12(b)(6), and a motion to transfer venue, under 28 U.S.C. § 1404(a), they commonly address the venue motion first, and, where transfer is appropriate, leave the motion to dismiss to be decided by the transferred court." *Schweitzer v. Nevels*, 669 F. Supp. 3d 242, 246 (2023) (collecting cases). The Court sees no reason why the principle of deferring to the transferee court to determine the merits of the existing motion to dismiss based on abstention.

In light of the foregoing and given that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them", the Court finds it is better practice to determine whether a different court presents a better venue to unravel the issues in this matter and, if so, leave the abstention determination to that court. *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976).

### a. Severance

#### i. Legal Standard

Rule 21 provides that "[t]he court may . . . sever any claim against a party." Fed. R. Civ. Proc. 21. Rule 21 grants trial courts "broad discretion" when deciding whether to sever claims. *Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 206 F. Supp. 3d 869, 918 (S.D.N.Y. 2016) (quoting *Oram v. SoulCycle LLC*, 979 F. Supp. 3d 498, 502 (S.D.N.Y. 2013)). In the Second Circuit, courts consider five factors to determine whether severance is proper: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common question of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be

avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *Taylor v. Molina*, 22-cv-09747 (ALC), 2024 WL 2093467, at *1 (S.D.N.Y. May 9, 2024) (quoting *Oram*, 979 F. Supp. 3d at 502-03)). "[T]he moving party bears the burden of demonstrating that severance is required to avoid prejudice or confusion and to promote the ends of justice." *Id.* (quoting *Agnesini v. Doctor's Assocs., Inc.*, 275 F.R.D. 456, 458 (S.D.N.Y. 2011). With regard to the first factor, claims flow from the same transaction or occurrence when they are "logically related". *Ardolf v. Weber*, 332 F.R.D. 467, 480 (S.D.N.Y. 2019) (quoting *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008)). The presence of one of these factors is sufficient to warrant severance, though severance is reserved for "exceptional circumstances." *Oram*, 979 F. Supp. 2d at 503 (internal citations omitted).

### ii. Discussion

At the outset, the Court notes that Plaintiffs' Section 1983 conspiracy claim is the only real barrier to severing the various remaining claims. As Plaintiffs' rightly point out, "the existence of a conspiracy . . . anchors together claims against multiple different defendants . . . ." (Opp. Venue p.16 (citing, among others, *Lyons v. Litton Loan Servicing LP*, No. 1:13-cv-513 (ALC) (GWG), 2014 WL 5039458 (S.D.N.Y. Sept. 29, 2014; *Green v. Beer*, No. 06 Civ. 4156 (KMW) (JCF), 2009 WL 3401256 (S.D.N.Y. Oct. 22, 2009); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279 (S.D.N.Y. 2000)). Accordingly, the Court will not sever Plaintiffs' Section 1983 conspiracy claim.

Because the Court disposes of the Section 1983 conspiracy claim on other grounds, *see infra*, however, the Court will exercise its "broad discretion" under Rule 21 and proceed

with the severance analysis as it pertains to the Plaintiffs' remaining claims. *Erausquin v. Notz, Stucki Management (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 722 (S.D.N.Y. 2011).

### 1. Whether the Claims Arise out of the Same Transaction or Occurrence

Plaintiffs' remaining claims are not "logically related". Plaintiffs' claims against the Wyoming, Onondaga, Salina, and Colonie each involve separate, discrete defendants and allegations. *Cf. Ardolf*, 332 F.R.D. at 480 (finding claims were logically related because they shared a defendant); (*see also* Mem. Supp. Venue pp.6-29). The same is true of Plaintiffs' Fourth Amendment claims against Onondaga, Salina, and Colonie from the Eighth Cause of Action (the "8th CoA Claims"). (*See* SAC ¶¶ 455-63). Similarly, each arises out of a separate basis: the Wyoming Order, the Onondaga Action, Salina Action, and Colonie Action, respectively.

As will become apparent, Plaintiffs' arguments rely almost exclusively on its Section 1983 conspiracy claim to ward off severance. (*See, e.g.,* Opp. Venue pp.14-19). For instance, and as previously noted, Plaintiffs assert that courts are loathe to sever claims "when there are allegations that the defendants coordinated their efforts." (*Id.* p.19). Such arguments are inapt given the Court is not severing the Section 1983 conspiracy claim.

Plaintiffs attempt to rely on *U.S. v. Yonkers Bd. of Ed.*, 518 F. Supp. 191 (S.D.N.Y. 1981) for the proposition that even absent an "allegation of conspiracy, courts in this Circuit find claims against multiple defendants to be logically related when those claims gave rise to a broader harm or injury." (Opp. Venue p.20). The Court struggles to square that assertion with the *Yonkers* court's holding that "[t]he allegations in the complaint against [the three defendants] and their *interrelated activities* are logically related and constitute a series of transactions or occurrences . . . ." *Yonkers Bd. of Ed.*, 518 F. Supp. at

196 (emphasis added). Indeed, the *Yonkers* court emphasized the fact that the appointments to the two defendant agencies were made by the same entity, Yonkers. *Id*. Here, each of Wyoming, Onondaga, Salina, and Colonie are separate municipal entities without a common source of control. Further, the Court cannot find any reference at the location cited[48] by Plaintiffs to support its contention that the *Yonkers* court denied severance at least partially out of concern that the plaintiffs in that action would have to litigate multiple disputes. *See generally, Id.* at 195-96. The *Yonkers* court, in actuality, denied the motion to sever without prejudice and openly contemplated the possibility that severance may be appropriate as the litigation, and discovery, proceed. *Id*. at 197.

Similarly, Plaintiffs reliance on *Randle v. Alexander*, 960 F. Supp. 2d 457 (S.D.N.Y. 2013) is also unpersuasive. Again, that court focused on the fact that the underlying allegations "steam from the initial allegation of [a] forced fight" at a correctional facility. *Randle*, 960 F. Supp. 2d at 486. As the Court is maintaining jurisdiction over the Section 1983 conspiracy claim and dismissing it on other grounds, there is no like commonality such that would warrant that the Court maintain these claims.

In light of the foregoing, then, Plaintiffs' remaining claims do not arise from the same transaction or occurrence.

### 2. Whether There Are Common Questions of Law and Fact

None of the pertinent claims involve common questions of law or fact. For one, the legality of the Wyoming Order or the allegations underpinning the 8th Court of Appeals Claims against Onondaga, Salina, and Colonie have no bearing on the appropriateness of any of the Onondaga Action, Salina Action, or Colonie Action. Nor is the Wyoming Order

---

[48] *See* Opp. Venue p.21.

relevant to the 8th CoA Claims. Similarly, each of the Onondaga, Salina, and Colonie Actions are discrete disputes without factual crossover. It is true that the issues in each of these actions may be similar, but there are no common question "at the core" of any of the actions that is relevant to determining the outcome of another. *Cf. Kehr,* 596 F. Supp. 2d at 827 (noting that "[a]t the core of both . . . claims is the question of whether the . . . design was defective").

Plaintiffs attempt to argue that because the questions of law (e.g., whether Defendants violated Title II) are alike, they are also common. In support , Plaintiffs rely on *Laureano v. Goord*, No. 06 Civ. 7845 (SHS) (RLE), 2007 WL 2826649 (S.D.N.Y. Aug. 31, 2007), *report and recommendation adopted*, 2007 WL 2852770 (S.D.N.Y. Sept. 28, 2007) In *Laureano*, the plaintiffs were inmates asserting violations of the Eighth and Fourteenth Amendments. *Id*.  The court found similar situated plaintiffs, inmates who suffered from mental illness, who called into question an institutional policy, New York States Dept. Corrections and Community Supervision policy concerning the treatment of inmates with mental health history. *Id.* at *9. The court found both common questions of facts and law and fact. *Id*. Here, it cannot be said that, for example, Wyoming shares some responsibility for alleged violations of CWP Syracuse's rights resulting from the Onondaga Action. Similarly, the legality of the Wyoming Order; the actions underlying the Onandago, Salina, and Colonie Actions; and the allegations underlying the 8th CoA Claims all involve distinct factual questions involving separate legal analysis.

As such, the Court finds there are no common questions of law or fact among the remaining claims.

### 3.  Whether Severance Would Hinder Judicial Economy and Efficiency

Severance would not hinder judicial economy and efficient. For one, discovery has not yet begun in this matter, let alone been completed. *See Agnesini*, 275 F.R.D. at 460 (noting that a "colossal waste" of judicial resources would arise if claims were severed following the completion of documentary discovery.) Moreover, discovery will vary by defendant and there is no indication there is "substantial overlap of witnesses or documentary proof" (Mem. Supp. Venue p.31); there is no obvious witness testimony or documentary evidence "relevant to support or disprove the claims of *each individual [p]laintiff.*" *Ardolf*, 332 F.R.D. at 481 (emphasis in original). Finally, by streamlining the issues and providing for separate actions that rely on little to no overlapping evidence or discovery, the courts will be able to proceed more quickly to a resolution on the claims. In other words, absent the Plaintiffs Section 1983 conspiracy claim, to proceed without severance would require this Court to hear what are, in essence, separate actions turning on separate pieces of evidence. *See Deajess Medical Imaging, P.C. v. Travelers Indem. Co.*, 222 F.R.D. 563, 564 (S.D.N.Y. 2004) (severing claims that, while presented as a collection of similar claims, would require a jury to hear evidence from what are, in actuality, multiple separate claims).

Plaintiffs' arguments are premised on severance of all claims. (*See, e.g.,* Opp. Venue p.28 ("Defendants fail to meet their burden to show that twenty-three separate litigations would be more efficient than one.")). Because of the Court's prior mootness analysis, though, and as already stated above, severance at this juncture would only result in four separate actions—with a significantly more limited scope and without evidentiary overlap. Severance therefore weighs in favor of judicial economy and efficiency.

### 4. Whether Granting Severance Would Give Rise to Prejudice

The prejudice factor weighs against severance. Defendants claim that without severance, they would be prejudiced by the "likelihood of jury confusion" resulting from the numerous claims and parties in this action. (Mem. Supp. Venue p.35). Specifically, Defendants are concerned that in the event Plaintiffs were able to adduce evidence that one of the Defendants is a bad actor, the jury may improperly infer the rest of the Defendants were similarly disposed. (*Id*. pp.35-36).

Defendants' concerns, however, are assuaged by the limited scope of claims and Defendants subject to this motion following the Court's prior analyses. Again, only claims Wyoming, Onondaga, Salina, and Colonie are subject to the present motion. The Court is also confident that a "carefully crafted jury instruction" would remedy any potential jury confusion. *Oram*, 979 F. Supp. 2d at 504 (quoting *Epstein v. Kemper Ins. Companies*, 210 F. Supp. 2d 308, 320 (S.D.N.Y. 2002)).

### 5. Whether There Is Commonality of Witnesses and Evidence

There is limited, if any, overlap in witnesses and evidence. Plaintiffs themselves concede that there is, at least, "modest" differences in witnesses and documentary evidence. (Opp. Venue p.31). Again, however, Plaintiffs' arguments are premised largely on their Section 1983 conspiracy claim. (*See Id.* pp.31-33). Without that overarching claim, the evidence for each claim is sufficiently distinct. The pertinent Defendants here exercised separate powers, taking differing approaches, relying on differing grants of authority, to respond to the Humanitarian Program. For instance, a witness for Wyoming has no relevant knowledge to share regarding the Colonie Action.

As such, the final factor weighs in favor of severance.

Given that four out of the five severance factors do favor severance, the Court finds this to be one of the "exception circumstances" wherein severance is warranted and thus SEVERS all claims against Wyoming, Onondaga, Salina, and Colonie from this action.

### b. Transfer

Defendants request that, if claims are severed, that the claims against Wyoming be transferred to the Western District of New York and the claims against Onondaga, Salina, and Colonie be transferred to the Northern District of New York. (*Id.* pp. 37-38).

### i. Legal Standard

"For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought . . . ." 28 U.S.C. § 1404(a). "[T]he decision to transfer venue is within the discretion of the district court based on an individualized, case-by-case consideration of convenience and fairness." *Sadiant, Inc. v. Penstock Consulting, LLC*, 2024 WL 2847195, at *13 (S.D.N.Y. May 30, 2024) (quoting *Bank of Am., N.A. v. Wilmington Tr. FSB*, 943 F. Supp. 2d 417, 426 (S.D.N.Y. 2013) (cleaned up).

First, a court must determine that the instant action could have been brought in the proposed venue. *Id.* at *12. If so, transfer is still only proper if it is "in the interest of justice." *Id.* (quoting *Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013)). Courts in the Second Circuit generally determine whether transfer is "in the interest of justice" by considering the following, non-exhaustive factors: (1) the convenience of the witnesses and the availability of process to compel the attendance of unwilling witnesses; (2) the convenience of the parties; (3) the location of relevant

documents and the relative ease of access to sources of proof; (4) the locus of operative

facts; (5) the relative means of the parties; (6) the comparative familiarity of each district

with the governing law; (7) the weight accorded to the plaintiff's choice of forum; and (8)

judicial economy and the interests of justice. *Id*. (quoting *Bank of Am., N.A.*, 943 F. Supp.

2d at 426). No factor is itself dispositive, and the comparative weight of each factor turns

on the "particular circumstances of the case." *Smart Skins LLC v. Microsoft Corp.*, 2015

WL 1499843, at *4 (S.D.N.Y. March 27, 2015) (citing *EasyWeb Innovations, LLC v.

Facebook, Inc.*, 888 F. Supp. 2d 342, 348 (E.D.N.Y. 2012)).

### ii.  Discussion

Plaintiffs do not dispute that the claims against Wyoming and against Onondaga,

Salina, and Colonie could be brought in the Northern and Western Districts of New York,

respectively. (*See generally* Opp. Venue pp.34-52). The Court will therefore only consider

whether it is in the interest of justice to transfer the relevant claims.

### 1.  Convenience of the Witnesses & Availability of Process to Compel Their Attendance

Convenience of the witnesses weighs slightly toward transfer. Convenience of the

witnesses "has often been described as the single most important . . . factor." *Schweitzer*,

669 F. Supp. 3d at 247. Defendants are required to show both that original forum is

inconvenient for it and Plaintiffs would not be "substantially inconvenienced" by transfer.

*Schweitzer*, 669 F. Supp. 3d at 247 (2023). A mere shifting of inconvenience from one

party to the other is insufficient to warrant transfer. *Id*. (cleaned up). However, "[c]ourts

routinely transfer cases when the principal events occurred and the principal witnesses are

located in another district." *Id*. at 248 (citing *Viacom Int'l v. Melvin Simon Productions*,

774 F. Supp. 858, 867 (S.D.N.Y. 1991).

Defendants have noted certain specific witnesses for Salina and potential witnesses for Onondoga and Wyoming. (Mem. Supp. Venue pp.44-45). Defendants fail to identify any witnesses for Colonie. (*See generally Id.* pp.40-45). At this early juncture, the Court affords little weight to the lack of specificity with respect to the Defendants' witnesses: in any event, the witnesses will certainly be coming from outside the Southern District. Defendants argue that travel to the Southern District would present an inconvenience for witnesses proffered by Wyoming, Onondaga, Salina, and Colonie. (*Id.* p.45). The distances from Wyoming and Onondaga are significant. And it is indisputable that the "principal events [and] witnesses" are located outside the Southern District. *Schweitzer*, 669 F. Supp. 3d at 248.

Even so, Defendants' theory of inconvenience is limited to travel. Without more, the Court is compelled to afford only slight weight to the inconvenience of the witnesses in favor of transfer.

Neither party identifies any non-party witnesses and thus that factor is neutral. *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 268 (S.D.N.Y. 2012).

## 2. Convenience of the Parties

Convenience of the parties weigh in favor of transfer. Most pertinently, the Plaintiffs challenging the Onondaga, Salina, and Colonie Actions, with the exception of RRT, are located in Northern District of New York. With respect to RRT's claim against the Wyoming Order, as the party whose conduct is challenged, Wyoming faces a greater burden to produce documents and evidence, a process that is ameliorated, at least somewhat, by litigating in the Western District of New York.

Plaintiffs' concern regarding the burden faced by litigating numerous actions is militated by the fact, again, that, if transferred, each respective Plaintiffs would have to litigate, at most, two actions: RRT against Wyoming and RRT challenging the Onondaga, Salina, and Colonie Actions—the latter three would be before a single Northern District of New York court.

### 3. Location of Relevant Documents and the Relative Ease of Access to Sources of Proof

The location of the relevant documents and relative ease of access to sources of proof is neutral. Defendants note that the "declarations of states of emergency, local emergency orders, town codes, building codes, zoning laws[,]" and other relevant information is located in the districts they seek to transfer to. (Mem. Supp. Venue pp.46-47). In response, Plaintiffs contend that because their claims are "largely . . . premised on facial challenges to [Emergency Orders] and other predominately legal issues[,]" resolution of this matter will not require significant productions of documents or witnesses. (Opp. Venue pp.41-42). Nevertheless, it is true that the vast majority of the relevant documents are not located in the Southern District.

Plaintiffs further argue that "modern technology renders this factor insignificant when documents can be produced electronically." (*Id.* p.42). The Court is inclined to agree, particularly given the extensive record it has reviewed in connection with this Opinion & Order. However, the ease with which documents can be transmitted electronically does not make the Southern District any more convenient than the Northern or Western Districts. As such, this factor is neutral as to transfer.

### 4. The Locus of Operative Facts

The locus of operative facts weighs heavily in favor of transfer. The location of the operative events is a primary factor in determining a . . . motion to transfer." *Schweitzer*, 669 F. Supp. 3d at 247 (quoting *Smart v. Goord*, 21 F. Supp.2d 309, 316 (S.D.N.Y. 1998)) (internal quotations omitted); *see also Costello*, 888 F. Supp. 2d at 268 ("The locus of operative facts is an important factor to be considered in decided where a case should be tried.").

Plaintiffs attempt to center the facts of this case in New York City with the arrival of the Asylum Refugees. (Opp. Venue p.40). While undoubtedly the inciting event, a legally irrelevant one, as the Court has already held that none of the Plaintiffs have third-party standing to assert claims on behalf of the Asylum Refugees. Rather, the bases of Plaintiffs' alleged harms are either based on their contractual relationships or the Plaintiffs' own constitutional and statutory rights. The Wyoming Order was issued outside in the Western District. The Onondaga, Salina, and Colonie Actions initiated in the Northern District. The same is true of the pertinent allegations underpinning the relevant 8th CoA Claims. Moreover, Plaintiffs' reliance on the Section 1983 conspiracy claim is, again, irrelevant. (*Id*. pp.40-41).

In sum, the locus of operative facts for the claims against Wyoming is the Western District and for Onondaga, Salina, and Colonie is the Northern District. Therefore, this factor weighs significantly in favor of transfer.

### 5.  The Relative Means of the Parties

Defendants concede that the relative means of the parties is likely neutral. (Mem. Supp. Venue p.48). Plaintiffs do not argue otherwise (*see* Opp. Venue p.52), and thus the Court will consider this factor as neutral.

6.  **The Comparative Familiarity of Each District with the Governing Law**

7.

Defendants also concede that the comparative familiarity of each district with the governing law factor is neutral. (Mem. Supp. Venue p.48). Plaintiffs, however, contend that this Court has greater familiarity given the mass of filings made in this action and because of the related case of *Deide v. Day*. (Opp. Venue p.39).

The Court finds this factor to be neutral. While it is true that there has been extensive filings in this matter, the Court has yet to rule on the merits of any of Plaintiffs' claims other than those addressed in this motion. Further, given that the Court has already dismissed a vast number of claims and the majority of Defendants as a result of its mootness analysis, on a go-forward basis, it is familiarity with this Opinion & Order that is of particular concern. The courts in other districts are just as able to apply the rulings in this Opinion & Order forward as any other. This factor, then, is only neutral.

8.  **Plaintiffs' Choice of Forum**

As a general proposition, a plaintiff's choice of forum "is entitled to considerable weight . . . ." *Schweitzer*, 669 F. Supp. 3d at 249 (citing *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 659 (S.D.N.Y. 1998)). However, that weight is "diminished" when "the operative facts upon which the litigation is brought bear little material connection to the chosen forum." *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 376 (S.D.N.Y. 2006) (quoting *Nieves v. American Airlines*, 700 F. Supp. 769, 772 (S.D.N.Y. 1988)) (internal quotations omitted).

The Court has already set forth that the locus of operative facts with respect to the Wyoming Order; Onondaga, Salina, and Colonie Actions; and the pertinent 8th Court of

Appeals Claims are not located in the Southern District. As such, Plaintiffs' choice of forum is afforded minimal weight.

### 9.   Judicial Economy and the Interests of Justice

The Court previously addressed judicial economy and efficiency in its severance analysis and, thus, finds this factor weighs in favor of transfer for substantially the same reasons.

Plaintiffs' contentions in favor of maintaining its choice of forum are unavailing. (*See* Opp. Venue pp.38-39). First, given the Court's rulings, Plaintiffs would only have to litigate in two, rather than four districts. Similarly, there would only be two case schedules for Plaintiffs to manage. Plaintiffs' concerns regarding inconsistent results are also unavailing: whether the Wyoming Order is constitutional has no bearing on whether, for example, the Colonie Action is constitutional. The issues are discrete and lend themselves to discrete outcomes. Contrary to Plaintiffs' contentions, transfer would not force RRT to "litigate nearly identical claims" in multiple districts. (*Id*.). As previously set forth, RRT's claims against the Wyoming Order present discrete issues. Indeed, the facts, for example, of the Salina and Colonie Actions are themselves distinct, but would in any event, be litigated in one action in the Northern District.

Accordingly, this factor weighs in favor of transfer.

In sum, four of the eight factors weigh in favor of transfer. The rest are neutral and, given the locus of operative facts is located outside this district, Plaintiffs' choice of forum is afforded diminished weight. As such and on balance, the factors weigh towards transfer.

Plaintiffs' remaining claims against Wyoming are ordered TRANSFERRED to the Western District of New York. Further, Plaintiffs' remaining claims against Onondaga, Salina, and Colonie are ordered TRANSFERRED to the Northern District of New York.

## III.    Defendants' Motions to Dismiss on Abstention Grounds

The Court will now address the Defendants' motion to abstain. Defendants argue that the Court should abstain from adjudicating claims against the Counties based on *Colorado River* abstention. (Mem. Supp. MTD pp.64-68).[49] The Towns separately argue that *Younger* abstention applies to the claims alleged against them. (Town Supp. Mem. MTD pp.1-10).

In the interest of clarity, the Court notes that it will consider Orangetown Action, Rockland Action, Orange Petition, Orange Action, Newburgh Action, Dutchess Petition, and Poughkeepsie Action in this section as they are the only remaining enforcement actions following the Court's foregoing analyses.

The Court will first address the parties' arguments with respect to *Colorado River* abstention. Before proceeding, however, the Court reiterates that a motion to dismiss based on abstention grounds is deemed a Rule 12(b)(1) motion. *DeMaria*, 2024 WL 1076543, at *3.

### 1.   The Discontinued Actions

The Court will briefly address letters received from the parties indicating that certain of the enforcement actions have been discontinued. Beginning with the Poughkeepsie Action, the Towns seek to dismiss said action based on *Younger* abstention.

---

[49] The Court notes that Onondaga separately argues that *Burford* abstention applies with respect to claims brought against it. (*See* County Supp. MTD pp.12-14). Because the Court has transferred those claims to the Northern District of New York, it will not address Onondaga's separate argument.

(*See* Town Supp. MTD pp.1-8). *Younger* requires, among other things, "federal constitutional claims that involve or call into question *ongoing* state proceedings." *Martines v. Cnty of Nassau*, CV-05-5728 (JS)(MLO), 2006 WL 8435553, at *3 (E.D.N.Y. Sept. 13, 206) (cleaned up). Absent an ongoing proceeding, a court has no basis to abstain. *See Id.* at *4 (finding that the first prong of *Younger* was not satisfied following the discontinuance of the state action).

In regard to the Orange Action, the Court was informed by Orange of its "intent" to discontinue that action in a letter dated July 23, 2024. (*See* ECF No. 403). The Court will presume that such action has, in fact, been discontinued. As such, there is no basis for this Court to abstain under *Colorado River*. "Abstention doctrines like *Colorado River* are predicated on the existence of *pending* state litigation on parallel issues[] and . . . are inapposite [where] there is no longer anything pending in the state courts." *192 Morgan Realty, LLC v. Aquatorium, LLC*, 20-CV-3627 (RPK) (RML),  2022 WL 123567, at *4 (S.D.N.Y. Jan. 13, 2022) (quoting *Allstate Ins. Co. v. Longwell*, 735 F. Supp. 1187, 1192 (S.D.N.Y. 1990)) (emphasis added). The lapsed existence of a parallel state court proceeding "is not one of the extraordinary and narrow exceptions to the duty of a district court to adjudicate a controversy properly before it." *Id.* (quoting *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813 (1976)) (cleaned up). Instead, there must be the "presence" of a state proceeding over which a federal court may "simultaneously" exercise concurrent jurisdiction. *Id.* (internal citations omitted). Indeed, courts in the Second Circuit routinely decline to abstain under *Colorado River* when "no parallel state proceeding exists at the time that an abstention motion is decided." *Id.* (collecting cases).

The Court sees no reason to depart from such practice, and thus declines to abstain from exercising its jurisdiction over the Orange Action.

### 2.  Whether *Colorado River* Abstention Is Warranted

With respect to the Counties, *Colorado River* abstention does not apply. A court should abstain under *Colorado River* "only in those exceptional circumstances where concurrent state-court litigation could result in comprehensive disposition of litigation." *Deide v. Day*, 676 F. Supp. 3d 196, 218-19 (S.D.N.Y. 2023) (quoting *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998)) (internal quotations omitted). The threshold inquiry is whether the "federal and state proceedings are concurrent [and parallel.]" *Id.* at 219 (cleaned up). "Suits are parallel when substantially the same parties are contemporaneously litigating substantially the same issue in another forum." *Nationwide General Ins. Co. v. Rael Maintenance Corp.*, 1:23-cv-4433-GHW, 1:23-cv-4462-GHW, 1:23-cv-5193-GHW, 1:23-cv-8717-GHW, 2024 WL 1805544, at *4 (S.D.N.Y. Apr. 24, 2024) (quoting *Mochary v. Bergstein*, 42 F.4th 80, 85 (2d Cir. 2022)). Suits can be parallel without being "identical in every aspect." *Id.* (quoting *Highview Props. D.H.F. Inc. v. Town of Monroe*, 606 F. Supp. 3d 5, 29 (S.D.N.Y. 2022)).

If the federal and state proceedings are concurrent and parallel, a *Colorado River* analysis then requires the ad hoc balancing of six factors: (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the forum is less inconvenient for the other parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceeding have advanced more in one forum than in the others; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate

to protect the plaintiff's federal rights. *Id.* (citing *Highview Prop. D.H.F. Inc.*, 606 F. Supp. 3d at 29). No single factor is outcome determinative and "only the clearest of justifications will warrant dismissal." *Woodford v. Community Action Agency of Greene County, Inc.*, 239 F.3d 517, 522 (2d Cir. 2001) (cleaned up). Moreover, given the balance is weighted towards maintaining jurisdiction, a neutral factor is construed as one favoring retaining jurisdiction. *Id.* (internal citation omitted).

> ### a.  Whether the Rockland Action, Orange Petition, and Dutchess Petition Are Concurrent and Parallel

None of the Rockland Action, Orange Petition, or Dutchess Petition are concurrent and parallel proceedings. It is true that every party to one of the foregoing actions is also a party to this litigation—with respect to: (1) the Rockland Action, Rockland and Armoni (*See* SAC Ex. F); (2) the Orange Petition, Orange, Crossroads, and Ramada (*See Id*. Ex. G); and (3) the Dutchess Action, Dutchess, Route 9, and Sai Ram (*See Id*. Ex. H); *cf. Deide*, 676 F. Supp. 3d 196, 218-19 (S.D.N.Y. 20213) (holding *Colorado River* abstention did not apply largely because of the lack of commonality between the parties in the state and federal actions). And while Plaintiffs protest that RRT is not a party to any of those actions (*see* Opp. MTD pp.33-34), abstention is still proper when the parties are "substantially the same." *Nationwide General Ins. Co.*, 2024 WL 1805544, at *5 (quoting *Mochary v. Bergstein*, 42 F.4th 80, 85 (2d Cir. 2022)).

*Colorado River,* however, is inapplicable because the Plaintiffs did not affirmatively raise federal claims in the state court actions. Actions may still be parallel and concurrent without "precisely the same claims . . . made [so long as] the claims concern the same events, and involve sufficient overlap of subject matter." *Id*. (quoting *Bernstein*

*v. Hosiery Mfg. Corp. of Morganton*, 850 F. Supp. 176, 184 (E.D.N.Y. 1994)). It is undisputed that the Emergency Orders and the Humanitarian Program are at the factual heart of this matter and each of the state actions. As in *Deide*, though, the issues and relief sought are not the same. *Deide*, 676 F. Supp. 3d at 219. Each of the foregoing actions call into question "whether New York City is violating New York [state] law by instituting [the Humanitarian Program], or whether certain municipalities may enforce their local zoning codes and ordinances" but do not implicate whether any of the enforcement actions, themselves, are legally sound. *Id.*

Further, it is indisputable that the pertinent Plaintiffs could have brought their federal claims in the Rockland Action, Orange Petition, and Dutchess Petition once initiated. There is no requirement, though, that a party avail themselves of state court when a federal district court has jurisdiction over those claims. *See Woodford v. Community Action Agency of Greene County, Inc.*, 239 f.3d 517, 525 (2d Cir. 2001) (holding that, although plaintiffs could have brought federal claims in a state court action, because those claims were within the district court's jurisdiction they were entitled to pursue those claims in federal court).

Accordingly, *Colorado River* abstention is improper with respect to the Rockland Action, Orange Petition, and Dutchess Petition.

### 3.  Whether *Younger* Abstention Is Warranted

The Towns separately argue that *Younger* abstention applies to, pertinent here, the Orangetown Action. (Town Supp. MTD pp.1-10).

*Younger* abstention applies when there is a parallel, pending: (1) state criminal proceeding; (2) state civil proceeding akin to a criminal prosecution; and (3) proceeding

that implicates a State's interest in enforcing the orders and judgments of its courts. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (hereinafter, "*Sprint*"). Courts may also consider additional factors prior to performing a *Younger* analysis, namely whether: (1) there is an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides an adequate opportunity to raise federal challenges. *Cavanaugh v. Geballe*, 28 F.4th 428, 432 (2d Cir. 2022) (citing *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982)). To be clear, the latter three factors are simply additional factors to be considered before invoking *Younger*—they are not dispositive. *Id*. And *Younger* abstention, generally, is a narrow exception. *National R.R. Passenger Corp. v. McDonald*, 978 F. Supp. 2d 215, 238 (S.D.N.Y. 2013) (citing *CECOS Int'l, Inc. v. Jorling*, 895 F.2d 895 66 (2d Cir. 1990)). Moreover, "parallel challenges to the constitutionality of a statute or policy are typically not barred by *Younger* absent other factors indicating the plaintiffs' interest are legally interwoven or interconnected." *Spargo v. New York State Com'n on Judicial Conduct*, 351 F.3d 65, 83 (2d Cir. 2003) (citing *Steffel v. Thompson*, 415 U.S. 452 (1974)). There is an exception to *Younger* abstention "in cases of proven harassment or prosecutions undertaken by state officials in bad faith without the hope of obtaining a valid conviction . . . and where extraordinary circumstances render the state court incapable of fairly and fully adjudicating the federal issues before it." *Pawelsky v. County of Nassau, New York*, 684 F. Supp. 3d 73, 82 (E.D.N.Y. 2023) (quoting *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198, 201 (2d Cir. 2002)) (cleaned up).

Defendants argue the Orangetown Action falls into the second *Younger* category, that of a civil proceeding akin to a criminal prosecution. (Town Supp. MTD pp.2-8). Beginning with the *Middlesex* factors, the parties do not seem to dispute that the

Orangetown Action is an ongoing proceeding. (*See* Town Supp. MTD p.5; *see generally* Opp. MTD pp.32-41). Second, courts in this district have held that regulating zoning and land use, one of the bases for the Orangetown Action, is an important state interest. *See Thomas v. Venditto*, 925 F.Supp.2d 352 (E.D.N.Y. 2013); *Novie v. Village of Montebello*, No. 10-CV-9436 (CS), 2012 WL 3542222 (S.D.N.Y. Aug. 16, 2012).

With respect to the third *Middlesex* factor, Defendants argue the state court is an adequate forum for Plaintiffs to assert their federal constitutional and statutory claims. (Town Supp. MTD pp.6-7). Indeed, "New York State courts are an adequate venue for [a] plaintiff to ventilate its constitutional [and federal statutory] concerns [as such a] challenge will receive the full benefit of appellate review, and if needed, review in the Supreme Court of the United States." *Disability Rights New York v. New York*, 16 Civ. 7363 (AKH), 2017 WL 6388949, at *3 (S.D.N.Y. Aug. 16, 2017) (citing *Allen v. McCurry*, 449 U.S. 90, 105 (1980)). Plaintiffs note, however, that both the First and Fifth Circuits have held that claims under Title II must exclusively be brought in federal courts, and that, as of yet, the Second Circuit has not opined on the matter. (Opp. MTD p.40). Moreover, the Court notes that all of the cases Defendants rely on for the proposition that the Orangetown Action is akin to a criminal proceeding are from courts outside of this Circuit. (*See* Town Supp. MTD pp.4-5 (citing cases from the Ninth Circuit and the Eastern District of Missouri).

The Court makes no determination as to whether Title II claims must exclusively be brought in federal courts. In light of the foregoing uncertainty, the fact that abstention is a narrow exception, *McDonald*, 978 F. Supp. 2d at 238, and that "parallel challenges to the constitutionality of a statute or policy are typically not barred by *Younger* absent other

factors indicating the plaintiffs' interest are legally interwoven or interconnected,"[50] *Spargo,* 351 F.3d at 83, the Court declines to abstain under *Younger*.

## IV.    DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

The Court will now address Plaintiffs' Motion for Preliminary Injunction. (ECF No. 239). Plaintiffs seek a preliminary injunction "to prevent the Counties and Towns from enforcing and otherwise utilizing [the Emergency Orders] and from manipulating local town laws, zoning laws, and building codes as a scheme to harass, punish, and ultimately stop Plaintiffs from providing public accommodations, transportation, and other services to Asylum Refugees." (Mem. Supp. PI p.4). To reiterate and orient the analysis, the remaining defendants in this action are Orangetown, Rockland, Orange, Newburgh, Dutchess, and Poughkeepsie (the "Remaining Defendants") and the remaining Plaintiffs are Armoni, AIMS Newburgh, AIMS Orangeburg Crossroads, Hudson Conference, Patel, Ramada, Route 9, RRT, Sai Ram, and South Road (the "Remaining Plaintiffs").

### A.  LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor';

---

[50] With respect to interconnectedness and interwovenness, the Court reiterates its statement in *Deide* that "it is possible that both the [Emergency Orders] and the New York City program are unlawful", which indicates that while related, the underlying issues in the Orangetown Action and Plaintiffs' claims here can be analyzed for constitutional muster separate from each other. *Deide*, 676 F. Supp. 3d at 217.

and (4) that the 'public interest would not be disserved' by the issuance of an injunction."

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting

*Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

Where "a party seeks an injunction that will affect governmental action taken in the

public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically

show a likelihood of success on the merits—a serious question going to the merits is usually

insufficient[.]"    *Mullins*, 626 F.3d at 53. However, where a party seeks a mandatory

injunction "altering, rather than maintaining, the status quo," such as in this case, that party

"must meet [a] more rigorous standard." *Almontaser v. N. Y. City Dep't of Educ*., 519 F.3d

505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc.*

*v. Saban Entm't, Inc*., 60 F.3d 27, 33 (2d Cir. 1995) ("[W]e have required the movant to

meet a higher standard where ... an injunction will alter, rather than maintain, the status

quo . . .").   The moving party must establish "a clear showing that the moving party is

entitled to the relief requested," or show that "extreme or very serious damage" would

result in the absence of preliminary relief.    *Tom Doherty Assocs*., 60 F.3d at 34.

## B.  DISCUSSION

At the outset, the Court notes that the vast majority of Plaintiffs' argument is

premised on the Emergency Orders. (*See* Mem. Supp. PI pp.26-44, 54-64). The Court

reiterates its prior holding that—with the exception of the Wyoming Order, which is not

subject to this analysis—claims against those orders are moot. Thus, to the extent Plaintiffs'

request for injunctive relief is based on the Emergency Orders, such request is DENIED as

moot.

Plaintiffs, however, contend that the Remaining Defendants engaged in "pretextual and discriminatory application of facially neutral [l]ocal [l]aws, in violation of Section 1981, [Section] 1983, and Title II." (Mem. Supp. PI p.44). They further argue that such "pretextual and discriminatory application" of such laws is conflict-preempted under the Supremacy Clause. (*Id*. pp.62-64). These arguments are unavailing because there is no likelihood of irreparable injury absent the injunction.

As previously discussed, the Court was informed by letter that Poughkeepsie Action was discontinued in light of a permanent injunction issued in the Dutchess Petition. (*see* ECF No. 400). That permanent injunction prohibits, among others, Route 9, Sai Ram, South Road, Hudson Conference, and Patel from housing any Asylum Refugees and New York City from transporting Asylum Refugees to Dutchess, which encompasses Poughkeepsie. (*Id*. Ex. A). The Court was further informed by letter that the Orange Action had been discontinued. (ECF No. 402). A review of the docket[51] in the Orange Petition indicates that the City of New York, Crossroads, Ramada, AIMS Newburgh, and AIMS Orangeburg were enjoined from transporting or housing Asylum Refugees in Orange until further order of that court. (*See* Orange Petition NYSECF Dkt. No. 74).   A similar injunction prohibiting Armoni from housing Asylum Refugees was issued in the Rockland Action. (*See* Rockland Action NYSECF Dkt. No. 224).

In light of the issuance the state court injunctions, none of the Plaintiffs may transport Asylum Refugees to, or house Asylum Refugees in, Rockland, Orangetown, Orange, Newburgh, Dutchess, or Poughkeepsie. In other words, the issuance of the foregoing injunctions obviates any need for the pertinent Defendants to continue engaging

---

[51] A court can properly take judicial notice of documents filed in another court's docket to establish the fact of the litigation and related filings. *Prince v. Intercept*, 634 F. Supp. 3, 114, 126 (S.D.N.Y. 2022).

in allegedly discriminatory prosecutions. As such, there is no likelihood of irreparable injury as there is no need, let alone indication, for any Defendants to pursue further action. The Court further notes that Plaintiffs' Motion for Preliminary Injunction does not reference nor seek relief pursuant to 28 U.S.C. § 2283.[52] (*See generally* Mem. Supp. PI). As such, the Court did not consider Plaintiffs' motion as seeking to enjoin the actual state court proceedings.[53] Moreover, given the existence of the state court injunctions, issuance of its own preliminary injunction would essentially be superfluous. In light of that fact, such an order would fail to be" an extraordinary remedy" but, instead, a neutered one without any practical effect. *Winter*, 555 U.S. at 22.

In accordance with the foregoing, Plaintiffs' motion for preliminary injunction is DENIED.

## V.    DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Finally, the Court will address Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).

### A.  LEGAL STANDARD

Rule 12(b)(6) provides in relevant part that a party may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted

---

[52] 28 U.S.C.A. § 2283 provides that a court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

[53] This finding is further supported by the SAC, which states Plaintiffs seek a "preliminary . . . injunction . . . enjoining and restraining the Defendants from 1) enforcing the Emergency Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral [sic] local town or municipal zoning and/or building codes; and b) directing Defendants to cease interfering with Plaintiffs' lawful agreements and permitting Plaintiffs to perform same by making public accommodations, transportation and services available to their hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements . . . ." (SAC pp.101-03).

as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Factual allegations must

"nudge [a plaintiff's] claim from conceivable to plausible." *Twombly*, 550 U.S. at 570. A

claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable

inference the defendant is liable for the unlawful activity alleged. *Iqbal*, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim, the district court is normally

required to look only to the allegations on the face of the complaint . . . the court may [also]

consider documents that are attached to the complaint, incorporated in it by reference, [or]

integral to the complaint." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020)

(quotation marks omitted).

In assessing the sufficiency of the claims, the court is "not required to credit

conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v.

UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the

"framework of a complaint," "threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678-79.

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint

is inapplicable to legal conclusions." *Id.* at 678.

## B.  FIRST CAUSE OF ACTION – CONTRACT CLAUSE

Plaintiffs' First Cause of Action alleges violations of the U.S. Constitution's

Contract Clause. (SAC ¶¶ 379-390).

The Contract Clause provides "[n]o State shall pass any . . . Law impairing the

Obligation of Contracts." U.S. CONST. art. I § 10, cl. 1. "Although facially absolute, the

Contract Clause's prohibition is not the draconian provision that its words might seem

imply." *DoorDash, Inc. v. City of New York*, 692 F. Supp. 268, 289 (S.D.N.Y. 2023) (quoting *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367-68 (2d Cir. 2006)) (cleaned up). In other words, a court must "accommodate the Contract Clause with the inherent police power of the State to safeguard the vital interests of its people." *Id.* (cleaned up). In deciding whether a plaintiff has stated a Contract Clause claim, courts consider: (1) whether the contractual impairment is substantial; (2) whether the law serves a legitimate public purpose; and (3) whether the means chosen to accomplish that purpose are reasonable and necessary. *Id.* (citing *Connecticut State Police Union v. Rovella*, 36 f.4th 54, 63 (2d Cir. 2022), *cert denied*, --- U.S. ---, 143 S. Ct. 215 (2022)).

Based upon a review of the allegations, RRT has failed to assert sufficient facts to demonstrate that its rights under the NYC Contract have been substantially impaired. First, the Court has already found that RRT's claims premised on the Emergency Orders have been rendered moot by their lapse or issuance of revised orders, as the case may be. Second, given RRT has not alleged in their pleadings that it has existing contracts with any of the Hotel Plaintiffs, they cannot complain of substantial impairment with respect to the state court actions initiated in Rockland, Orange, or Dutchess.[54] Whatever the provenance and motivation in initiating those actions, it was the New York state courts that issued the injunctive relief that now serves as an impediment to the transport of Asylum Refugees, not the named Defendants. Moreover, to the extent that RRT is prohibited from transferring Asylum Refugees to the Remaining Defendants' jurisdictions, RRT is able to transport

---

[54] The Court re-emphasizes that throughout its pleadings RRT Plaintiff routinely refer to its "contract" with New York City but, does not refer to any existing contracts with any of the Hotel Plaintiffs. Instead, RRT Plaintiff mentions "agreement(s)."

Asylum Refugees to those Counties whose Emergency Orders have lapsed or been revised to cure possible constitutional infirmities.[55]

Accordingly, Plaintiffs' First Cause of Action is DISMISSED without prejudice.

## C. SECOND CAUSE OF ACTION – TITLE II

Title II of the Civil Rights Act of 1964 "secures the right to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation without discrimination or segregation on the ground of race, color, religion, or national origin." *Deide*, 676 F. Supp. 3d at 227 quoting *Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc.*, No. 21-CV-5749 (JMW), 2023 WL 2632461, at *9 (E.D.N.Y. Mar. 24, 2023) (cleaned up). It is undisputed that hotels and motels are places of public accommodation under Title II. 42 U.S.C. § 2000a(b)(1) (defining public accommodation to include hotels, motels, and other establishments that provide lodging to transient guests). To assert a plausible Title II claim, a plaintiff "must allege facts which show he or she was deprived of equal use and enjoyment of a covered facility's services and facts which demonstrate discriminatory intent." *Id.* at 227-28 (internal quotation and citations omitted). When asserting a claim under Title II, an aggrieved party cannot obtain monetary damage but may be entitled to a remedy in the form of prospective relief for the plaintiff or those similarly situated. See *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 401, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). To demonstrate standing for prospective relief, a plaintiff must plead and prove a "real and immediate threat of repeated injury." *James v. Am. Airlines, Inc.*, 247 F. Supp. 3d 297, 305 (E.D.N.Y. 2017) (internal citations omitted).

---

[55] The only limitation imposed with respect to the housing of Asylum Refugees is that the respective hotels must comply with social services law and local zoning laws/regulations.

The Court has already held that Plaintiffs do not have third-party standing to assert claims on behalf of the Asylum Refugees, who seek to "secure the right to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation without discrimination." As such, Plaintiffs' only contention is that interference with the remaining Hotel Plaintiffs' "legal obligations" under Title II are sufficient to sustain a claim. (Opp. MTD p.67). Plaintiffs provide no citation in support of that contention, and indeed, the Court has been unable to locate any. Title II is thus inapt for the remaining Plaintiffs. The SAC makes no allegations of discrimination based on the race or national origin of individuals associated with RRT or the remaining Hotel Plaintiffs. *Cf. Radar Sports Management, LLC*, 2023 WL 2632461, at *5 (holding that the first element of Section 1981 claim "is presumably met" because the plaintiff's lacrosse team consisted of 25% minority players and more than 50% of the team's coaches were Black).[56] Plaintiffs' reliance on this Court's ruling in *Deide* is unpersuasive as, in that case, it was the actual Asylum Refugees who commenced the action and asserted direct claims. *See Deide*, 676 F. Supp. 3d at 227-28.

Accordingly, Plaintiffs' Second Cause of Action is DISMISSED without prejudice.

---

[56] The Second Circuit has indicated that discrimination claims under Title II are subject to the same analysis as discrimination claims under 42 U.S.C. § 1981. *Guichardo v. Langston Hughes Queens Libr.*, No. 15-CV-2866 (MKB), 2015 WL 13227995, at *3 (E.D.N.Y. Nov. 20, 2015); see also *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104–06 (2d Cir. 2001)

### D.  THIRD CAUSE OF ACTION – FOURTEENTH AMENDMENT EQUAL PROTECTION & DUE PROCESS CLAUSE

Plaintiff's Third Cause of Action is premised on an alleged violation of the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution provides that  "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *Brown v. City of Oneonta, New York*, 221 F.3d 329, 336–37 (2d Cir. 2000). This constitutional provision basically provides that persons similarly situated should be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985) citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394 (1982). To state a claim for a violation of his or her right to equal protection, a  plaintiff must allege that (1) "compared with others similarly situated, plaintiff was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir.2004) quoting *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir.1999); see also *Milfort v. Prevete*, 922 F. Supp. 2d 398, 410 (E.D.N.Y. 2013). There are typically two types of equal protection claims that require similarly situated comparators: selective enforcement or selective treatment claims, and class of one claims.  *White v. City of New York*, 206 F. Supp. 3d 920 (S.D.N.Y. 2016). "[A] plaintiff alleging an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facially neutral policy or statute, generally need not plead or show the disparate treatment of similarly situated individuals." *White v. City of New York*, 206 F.

Supp. 3d at 930 (S.D.N.Y. 2016) quoting *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir.2001).

Plaintiffs assert a Fourteenth Amendment due process claim on grounds that the Emergency Orders and alleged "discriminatory prosecution and enforcement of local zoning" interferes with their (the Plaintiffs and Asylum Refugees) right to intrastate travel. (SAC ¶¶ 404-05). The "fundamental right to travel within a state" is well established in the Second Circuit. *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008); *Jeffery v. City of New York*, No. 20-CV-2843, 2022 WL 204233, at *5 (E.D.N.Y. Jan. 24, 2022) ("Freedom of movement, which includes the freedom to travel within a state, is a well-established fundamental right"). The fundamental right to travel within the United States, referred to as the right to free movement, exist regardless of one's citizenship status. *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 99 (2d Cir. 2009) citing *Williams v. Town of Greenburgh*, 535 F.3d at 75; cf. *Saenz v. Roe*, 526 U.S. 489, 500, 119 S.Ct. 1518 (1999). Laws and policies that burden the fundamental right to free movement within the state are subject to strict scrutiny. *Williams v. Town of Greenburgh*, 535 F.3d at 75; *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 648 (2d Cir. 1971) (applying strict scrutiny to a five-year residency requirement for municipal public housing because such law affected a "fundamental right" to travel for individuals arriving from outside of the city); *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (because the curfew in question "limit[ed] the constitutional right to free movement within the [t]own ..., we assume that were this ordinance applied to adults, it would be subject to strict scrutiny.")

Plaintiffs also allege they have been denied the "right to freely . . . transport Asylum Refugees to places of public accommodation." (Id. ¶ 405). Plaintiffs appear to abandon this

contention in their opposition by making no mention of it and more narrowly frame their claim by asserting "the SAC alleges the Emergency Orders and State Actions 'actually deter' Asylum [Seekers'] travel to Defendants' respective jurisdictions . . . ." (Opp. MTD p.66). In the interest of completeness, the Court was unable to find any case law supporting a Fourteenth Amendment right to transport individuals.[57]

As previously mentioned, claims asserted on the basis of the Emergency Orders are deemed moot as those orders have been allowed to lapse and not renewed or allowed to lapse and have been revised.  Additionally, to the extent Plaintiffs have attempted to assert such claim on behalf of Asylum Refugees, they lack third party standing. The Remaining Hotel Plaintiffs are not, themselves, barred by any Emergency Orders or enforcement actions from traveling intrastate. The claim nevertheless fails for other additional reasons. Most notably, the SAC fails to allege Plaintiffs were treated differently compared to others similarly situated. Such a showing is a "prerequisite" and a "threshold matter" to a selective treatment claim. *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 692 (S.D.N.Y. 2011) citing *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir.2004)

The U.S. Supreme Court has also recognized equal protection claims brought by a "class of one," where the plaintiff alleges that he or she was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000) (internal citations omitted). "[C]lass-of-one plaintiffs must show an extremely high degree

---

[57] The Court found one district court opinion  which appears to stand for the proposition that there is no constitutional right to provide transportation. See *Miller v. Alexander*, No. 07CV3533(JS)(WDW), 2008 WL 4068537, at *3,fn 1 (E.D.N.Y. Aug. 26, 2008)

of similarity between themselves and the persons to whom they compare themselves."
*Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) quoting
*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir.2006). Here, Plaintiffs once again fail
to allege entities or establishments sufficiently similar that were treated more favorably by
the County and Town Defendants.

Plaintiffs argue that the enforcement actions were "pretextual [and made] to
effectuate a discriminatory purpose." (Opp. MTD p.64) Moreover, Plaintiffs define the
Defendants' motivation as "discriminatory animus based on the race, alienage status,
and/or national origin of Asylum [Refugees.]" (*Id*.). A review of the pleadings makes clear
that the target of the alleged racial or alienage animus are the Asylum Refugees. The
Remaining Hotel Plaintiffs and RRT fail to state an equal protection claim because they
do not have third-party standing to assert claims on behalf of Asylum Refugees. Lastly,
Plaintiffs' reliance on *Savino v. Town of Se*., 983 F. Supp. 2d 293, 302 (S.D.N.Y. 2013),
aff'd, 572 F. App'x 15 (2d Cir. 2014), is unpersuasive. Similar to the instant case, in *Savino*,
the plaintiff asserted an equal protection claim based on alternative theories of liability. Id
at 302. Unlike here, however, the court in *Savino* was tasked with resolving a summary
judgment motion wherein the plaintiff asserted a direct claim against the defendant town
for discriminatorily applying a facially neutral zoning law(s) on the basis of national origin.
Id.  at 303-306.

In light of the foregoing, Plaintiffs' Fourteenth Amendment Equal Protection claim
is deemed DISMISSED without prejudice.

.     **FOURTH CAUSE OF ACTION – SECTION 1981**

Section 1981(a) provides that "[a] all person within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The rights protected by Section 1981 are protected against impairment by nongovernmental discrimination and impairment under color of State law. 42 U.S.C.A. § 1981(c). The term "under color of State law" has been interpreted to refer  only to state actors, not federal officials. *Ercole v. Wilkie*, No. 19-CV-11961 (LLS), 2020 WL 1489797, at *3 (S.D.N.Y. Mar. 27, 2020) citing *Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005).

Under Section 1981, "make and enforce contracts" is interpreted to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The Second Circuit has held that Section 1981's prohibition extends to claims alleging discrimination on the basis of alienage. *Anderson v. Conboy*, 156 F.3d 167, 178 (2d Cir. 1998). To sustain a claim under Section 1981, a plaintiff must allege: (1) the plaintiff is a member of a racial . . . minority [or is an alien]; (2) an intent to discriminate on the basis of race [or alienage] by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Akyar v. TD Bank US Holding Co.*, 18-CV-379 (VSB), 2018 WL 4356734, at *3 (S.D.N.Y. Sept. 12, 2018) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). A non-minority and/or non-alien may bring claims under Section 1981 claim if they are "personal[ly] injure[d by] a defendant's discriminatory conduct . . . ." *See Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 476 (S.D.N.Y. 2013) citing *Pisello v. Town of Brookhaven*, 933 F. Supp.

202, 215 (E.D.N.Y. 1996); *see also Albert v. Carovano*, 851 F.2d 561, 572–73 (2d Cir.1988) ( a non-minority plaintiff may bring an action under Section 1981 against one who has retaliated against them because they did not engage in purposeful racial discrimination in a contractual or marital context ... or because they objected to the defendant's purposeful discrimination). To bring a claim as a non-minority, the plaintiff must be the "direct target of the defendant's discriminatory action." *Pisello v. Town of Brookhaven,*, 933 F. Supp. at 215 quoting *Benjamin v. Aroostook Medical Ctr., Inc.*, 57 F.3d 101, 105 (1st Cir. 1995).

Since the Court's ruling in *Dotson v. Griesa*, this Circuit has joined with  nine other appellate courts in concluding that Section 1981 does not provide a separate private right of action against state actors. *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018); see also  *Buntin v. City of Bos*., 857 F.3d 69, 72 (1st Cir. 2017); *Brown v. Sessoms*, 774 F.3d 1016, 1021 (D.C. Cir. 2014); *Arendale v. City of Memphis*, 519 F.3d 587, 598 (6th Cir. 2008); *Bolden v. City of Topeka, Kan*., 441 F.3d 1129, 1137 (10th Cir. 2006); *Oden v. Oktibbeha Cnty., Miss*., 246 F.3d 458, 464 (5th Cir. 2001); *Butts v. Cnty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995). Such ruling is consistent with the U.S. Supreme Court's decision in *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701,733, 109 S. Ct. 2702, 2722 (1989) which held that Section 1983 remains the exclusive remedy through which a litigant may seek redress for violations of the rights guaranteed by Section 1981. Where a plaintiff neither pleads the elements of nor alleges a Section 1983 claim, any "claims pursuant to § 1981 are dismissed as a matter of law." *Beharry v. City of New York*, No. 18-CV-2042 (AJN), 2019 WL 634652, at *3 (S.D.N.Y. Feb. 14, 2019). Just as was the case in *Beharry*, the Plaintiffs in the instant action

allege neither a Section 1983 claim nor its elements, and therefore the Court must dismiss Plaintiffs Section 1981 claims, finding they fail as a matter of law. Id.

As such, Plaintiffs' pleadings are insufficient to assert a plausible claim pursuant to Section 1981 and the claim is deemed DISMISSED with prejudice.

### E.  FIFTH CAUSE OF ACTION – FIFTH AMENDMENT TAKINGS CLAUSE

The Takings Clause of the Fifth Amendment states that "private property [shall not] be taken for public use, without just compensation." *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 184; 139 S. Ct. 2162, 2167(2019) quoting *In Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108 (1985). The Takings Clause "does not prohibit the taking of private property, but imposes upon the government a condition on the exercise of that power, just compensation. *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 536, 125 S. Ct. 2074, 2080 (2005) (internal citations omitted). The Takings Clause extends to two distinct types of takings, physical and regulatory. *Lingle v. Chevron U.S.A., Inc*., 544 U.S. at 537.

When governmental action does not involve "a physical occupation," but serves to "affect the use and value of private property, such actions are considered regulatory takings. See *Elmsford Apartment Associates, LLC v. Cuomo*, 469 F. Supp.3d 148, 162-63 (S.D.N.Y. 2020). Stated differently, a regulatory taking is defined as a governmental regulation or restriction on private property that is so onerous that its effect is the equivalent to a direct appropriation or ouster. *Lingle v. Chevron U.S.A. Inc*., 544 U.S. at 537; see also *Horne v. Dep't of Agric*., 576 U.S. 350, 360; 135 S. Ct. 2419, 2427 (2015); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415; 43 S.Ct. 158, 160 (1922). In a typical regulatory

taking, the regulation completely deprives the plaintiff/owner of all economically beneficial use of the property. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. at 538; see *also Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448 (2001). Such a taking is often referred to as a categorical taking. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. at 538; see also *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330, 122 S.Ct. 1465 (2002); *Sherman v. Town of Chester*, 752 F.3d 554, 564 (2d Cir. 2014);

A second regulatory taking can occur when the regulation "works a less-than-total destruction of value [which] has gone too far." *Cmty. Hous. Improvement Program v. City of New York,* 492 F. Supp. 3d 33, 46 (E.D.N.Y. 2020), aff'd, 59 F.4th 540 (2d Cir. 2023), and aff'd sub nom. *74 Pinehurst LLC v. New York*, 59 F.4th 557 (2d Cir. 2023) (internal citations omitted). Such a taking, "[a]nything less than a complete elimination of value," "is a non-categorical taking." *Sherman v. Town of Chester*, 752 F.3d at 564 citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. at 330. (internal quotation marks omitted). A "non-categorical taking" has also be defined as a regulation which interferes with a "reasonable investment backed expectations" which has a "substantial economic impact*." Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. at 322.

Non-categorical takings are analyzed under the framework articulated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646 (1978), which requires an intensive ad hoc inquiry. See *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224–25 (1986). There are three factors to be weighed when conducting this analysis: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the

character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. at 124-28. "Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations. *Lingle v. Chevron U.S.A. Inc*., 544 U.S. at 538–39. Consideration of these factors focus on "identify[ing] regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id*.  at 539.

A review of the SAC reveals that Plaintiffs Takings Clause claims are based upon the Emergency Orders and the County Defendants alleged "selective prosecution and enforcement of facially-neutral local town or municipal zone and/or building codes. (SAC, p. 95.) In their motion papers, the claim is more narrowly construed as one asserted by the Plaintiff Hotels wherein the "[d]efendant's regulatory conduct via [the] EOs, and as-applied conduct by *commencing zoning actions* (emphasis added), have made their contracts with RRT completely illegal, such that they cannot perform their obligations". (See Opp. MTD p.72.)  Liberally interpreting the allegations, the deprivation is RRT's inability to fulfill its contractual obligations with New York City to enter into contracts with the Plaintiff Hotels for the purpose of providing temporary housing, not to the general public, but to a sub-set of individuals, Asylum Refugees. Notably in their pleadings and motion papers, other than in conclusory fashion, Plaintiffs do not allege the extent to which the Executive Orders, state actions or zoning regulations have deprived them economically of the beneficial use of their facilities affected. The Plaintiffs fail to make such allegations either individually or collectively.

The Court's review of similar cases involving an Executive Order wherein a non-categorical taking was alleged and failed to meet the plausibility standard lacked a showing of near total denial of economic value. See *Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425 (S.D.N.Y. 2022) (finding that a non-categorical taking had not occurred for restaurants during COVID-19 pandemic when EOs required restaurants to close their indoor dining but still allowed take-out and delivery services). For non-categorical takings, wherein the *Penn* factors have been applied, courts are wont to find a taking when the restrictions are "temporary," "prospective in application," and consist of "negative restrictions rather than . . . affirmative exploitations by the state." Id. at 443 quoting *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006)). Moreover, a taking does not occur because a property is prevented from making the most financially beneficial use of a property. See *Kabrovski v. City of Rochester, N.Y.*, 149 F. Supp. 3d 413, 425 (W.D.N.Y. 2015). Courts have also been hesitant to declare a government action a regulatory taking when the character of the action is "uncharacteristic of a taking"—i.e., that nothing was affirmatively taken by the government but the government had annulled something such as a contractual right to a higher wage or limited further business. See *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d at 375 (a temporary and partial nature of wage freeze weighed against finding a taking); *Everest Foods Inc. v. Cuomo*, 585 F. Supp 3d at 444 (restriction on restaurants permitting only take-out or delivery was not deemed a taking).

Here, as previously discussed, many of the Executive Orders were temporary in duration, were allowed to lapse and not re-instated or revived. Additionally, multiple County Defendants have issued revised or replacement emergency orders which generally permit the housing of individuals in establishments of public accommodation such as hotels

and motels, so long as the facilities comply with pertinent New York state social services laws and applicable zoning laws.

For all the reasons provided, it is the Court's determination that the Plaintiffs have failed to assert a plausible Fifth Amendment Takings Clause claim. The claim is DISMISSED without prejudice.[58]

## F.  SIXTH CAUSE OF ACTION – SUPREMACY CLAUSE - CONFLICT PREEMPTION

Plaintiffs Sixth Cause of Action is premised upon the alleged violation of the Supremacy Clause. (SAC ¶¶ 436-446). Plaintiffs allege the Executive Orders, as well as the Orangetown, Newburg, Poughkeepsie, Salina and Colonie's selective and targeted enforcement of their zoning codes, violate the Supremacy Clause and the U.S. Constitution and federal immigration laws and policies. Id.  It is well settled that the Supremacy Clause is not the source of a federal right. (*Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 324, 135 S. Ct. 1378, 1383 (2015) citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107, 110 S.Ct. 444 (1989). The Supremacy Clause does, however, instructs the courts what to do when state and federal law conflict or clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. at 325. More precisely, the Supremacy Clause provides that courts must not give effect to state laws that conflict with federal laws. *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. at 324 320, 324 (internal citations omitted). Based on the foregoing, to the extent Plaintiffs attempt to assert a claim pursuant to an alleged violation of the Supremacy Clause, such claim is deemed DISMISSED.

---

[58] Plaintiff also references the issuance of the state court TROs as an impediment or mechanism used to deprive them of the economic benefits of their property and their lawful agreements. The TROs are limited in scope and affect a limited scope of the Plaintiff Hotels business.

The Supremacy Clause provides that "[t]his Constitution and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. There are generally, three types of preemption: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives. *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). Plaintiffs' motion papers suggest they are asserting a conflict preemption with respect to the Defendants conduct.

"Conflict preemption arises where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Art & Antique Dealers League of America, Inc. v. Seggos*, 394 F. Supp. 3d 447, 457 (S.D.N.Y. 2019) quoting *Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman*, 906 F. 3d 41, 49 (2d Cir. 2018) (cleaned up). Where a state is regulating on "subjects of state jurisdiction and the means chosen are at least plausibly related to matters of legitimate state concern, there is no conflict preemption unless clear damage to federal goals would result." *Id.* (cleaned up). "Courts must utilize their judgment to determine what constitutes an unconstitutional impediment to federal law, and that judgment is informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Deide*, 676 F. Supp. 3d at 213 quoting *Lozano v. City of Hazleton,* 724 F.3d 297, 302 (3rd Cir. 2013) (cleaned up).

Plaintiffs' claims against the Emergency Orders are moot. Moreover, Plaintiffs do not have third-party standing to assert claims on behalf of Asylum Refugees. Thus, Plaintiffs only remaining contention is that the Supremacy Clause protects "Plaintiffs' federal obligation to equally make public accommodations available to Asylum Refugees" from the Remaining Defendants' enforcement actions, which rely on state laws and zoning regulations. (Opp. MTD p.68). Plaintiffs cite no case to support this proposition. (*See Id*. pp.68-69). Indeed, Plaintiffs largely do no identify what federal law is ostensibly conflicted: the section header references Title II and "Federal Immigration Law". Given the Court has already found the Remaining Plaintiffs failed to state a plausible Title II claim, it is difficult to imagine how Title II's "purpose and intended effects" nevertheless mandate a finding that the enforcement actions are preempted under the Supremacy Clause. *Deide*, 676 F. Supp. 3d at 213.

With respect to federal immigration law, Plaintiffs do not cite a specific law in their Opposition. (Opp. MTD pp.68-69). The SAC, however, does make reference to the Refugee Act of 1980, 8 U.S.C. § 1522. (SAC ¶ 5). The Refugee Act created the Refugee Resettlement Program and the Office of Refugee Resettlement ("ORR"), which requires the ORR to consult with state and local governments "concerning the sponsorship process and the intended distribution among the States and localities before their placement in those States and localities." *State by and through Tennessee General Assembly v. United States Department of State*, 931 F.3d 499, 502 (6th Cir. 2019) quoting 8 U.S.C. § 1522(a)(2)(A) (cleaned up). In connection with the Refugee Act, Plaintiffs also cite to *Exodus Refugee Immigration, Inc. v. Pence, 165 F.Supp.3d 718 (S.D.I. 2016).* (SAC ¶ 5). In *Exodus*, the district court found the plaintiff's conflict preemption claim was "likely meritorious" when

the state of Indiana withheld federal grant money to support the OOR's mission as prescribed in the Refugee Act. *Exodus Refugee Immigration, Inc.*, 165 F. Supp. 3d at 727-28. None of the Refugee Act, the Refugee Resettlement Program, nor the ORR are implicated in the present action. Nor is there an assertion that either the state of New York or one of the many identified municipalities are impermissibly withholding federal funds earmarked for refugees. Therefore, based on the Plaintiff's factual assertions, and without a more developed argument as to what laws precisely preempt the Remaining Defendants' enforcement actions, the Court must DISMISS with prejudice Plaintiffs' Sixth Cause of Action which rely on the Supremacy Clause.

## G.  SEVENTH CAUSE OF ACTION – SECTION 1983 CONSPIRACY CLAIM

At the outset, the Court reiterates that Plaintiffs' Section 1983 conspiracy claim is the lone remaining claim asserted against *all* of the Defendants.

To state a claim for a Section 1983 conspiracy a plaintiff is required to allege: (1) an agreement between multiple state actors; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that unconstitutional injury causing damages. *Savarese v. City of New York*, 547 F. Supp. 3d 305, 343 (S.D.N.Y. 2021) quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A conspiracy claim is not an independent basis of liability in Section 1983 claim or action. See *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir.1995) (internal citation omitted). A plaintiff asserting a civil conspiracy claim under Section 1983 for the deprivation of a constitutional right, must demonstrate the violation of an underlying constitutional right. *Id*.

Because conspiracies are inherently secretive, circumstantial, rather than direct, evidence may be considered. *Pulizotto v. McMahon*, 406 F. Supp. 3d 277, 293 (S.D.N.Y.

2019) quoting *Pangburn*, 200 F.3d at 72). Still, a "plaintiff must allege facts beyond conclusory, vague, or general allegations to assert the existence of an agreement to inflict constitutional injury." *Id*. (quoting *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (cleaned up).

The SAC fails to allege facts giving rise to a plausible Section 1983 conspiracy claim. For one, despite Plaintiffs' insistence it is their "central allegation" (*see* Opp. MTD p.21), the SAC reflects an utter paucity of relevant allegations. Plaintiffs do allege that the Defendants worked "hand [] in hand" with each other, but in each instance their claims are conclusory. (SAC ¶ 15). For example, Plaintiffs assert "[t]he Towns[,] in coordination with the Counties, . . . have taken actions to further effectuate" their alleged harms. (*Id*. ¶ 16). As proof, Plaintiffs provide numerous quotes from various County and Town officials disparaging Asylum Refugees. (*Id*. ¶¶ 17 A-C; *see also Id*. ¶ 20-21). While such statements are indeed inflammatory and factually incorrect, they do not give rise to an inference of coordinated action. Similarly, Plaintiffs' claim that Onondaga and Salina purportedly coordinated in a raid on CWP Syracuse is inapt because there are no facts which connect each separate act (or raid) to the rest of the Defendants. (*Id*. ¶ 19). Other than asserted in a conclusory fashion, the same can be said of the separate state court actions initiated by certain Defendants. (*Id*. ¶¶ 22-26).

Plaintiffs also make the conclusory allegation that the Defendants "conspire[ed] and communicate[d]" with each other when issuing the Emergency Orders. (*See Id*. ¶ 154). Again, Plaintiffs point to individual comments made by certain County and Town officials referencing or "mimic[ing] a different County's Emergency Orders as proof of coordinated activity. (*Id*. ¶¶ 171, 198, 258). A Town official's knowledge of a County's Emergency

Order as a basis to exclude Asylum Refugees, however, does not give rise to an inference of coordination. Moreover, any similarity between the various Emergency Orders is insufficient to support a finding of conspiracy. To hold otherwise without more would allow any party aggrieved by counties taking similar acts taken in response to a situation or "crisis" to allege the existence of a conspiracy without evidence or factual allegations to support a finding of such and limit the efficacy of those responses.

In sum, Plaintiffs' Seventh Cause of Action relies on conclusory statements and is deemed DISMISSED without prejudice.

## H.  EIGHTH CAUSE OF ACTION – FOURTH AMENDMENT

Crossroads, AIMS Newburgh, Armoni, and AIMS Orangeburg are the only remaining Plaintiffs asserting Fourth Amendment claims against Newburgh, Orange, Rockland, and Orangetown. (*See* SAC ¶¶ 455-63).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and prohibits the issuance of warrants absent probable cause. U.S. CONST. amend. IV. The Fourth Amendment has been incorporated against the States. *Johnson v. City of Newburgh*, 690 F. Supp. 3d 224, 235 (S.D.N.Y. 2023) "It protects that which a person seeks to preserve as private, even in an area accessible to the public [so long as t]he expectation of privacy [is] one that society is prepared to considered reasonable." *Id.* (internal citations and quotations omitted). Stated differently, in order to receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is "prepared to recognize as legitimate." *New Jersey v. T.L.O.*, 469 U.S. 325, 338, 105 S. Ct. 733, 741, 83 L. Ed. 2d 720 (1985) quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3203, 82

L.Ed.2d 393 (1984). What is reasonable depends on the context within which a search takes place. *New Jersey v. T.L.O.,* 469 U.S. at 337, 105 S. Ct. at 740. Making a determination of reasonableness requires a "balancing of the need …[for the] …search against the invasion which the search entails." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 537, 87 S. Ct. 1727, 1735, 18 L. Ed. 2d 930 (1967). Warrantless searches and seizures are, with certain "specifically established and well-delineated exceptions", *per se* unreasonable. *Johnson v. City of Newburgh*, 690 F. Supp. 3d at 235 quoting *O'Rourke v. Huff*, 43 F. App'x 436, 436 (2d Cir. 2002) (summary order).

The Supreme Court has held that there is no reasonable expectation of privacy in areas where the "public was invited to enter and to transact business." *Maryland v. Macon*, 472 U.S. 463, 469 (1985). Such that an entry into a public area, say a hotel lobby or reception area may not give rise to an impermissible entry and, depending on the facts, an unlawful search. More than rote recitation or tracking of statutory language is required to place the Defendants on notice of the claim. See *Johnson*, 690 F. Supp. 3d at 236, n.5.

Fourth Amendment Claims asserting illegal searches are typically commenced pursuant to 42 USC§ 1983('Section 1983"). See *Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 812 (2009) (action brought by respondent pursuant to 42 U.S.C. § 1983 against state law enforcement officers who conducted a warrantless search of his house). Notably, the Plaintiffs do not assert the claim as against the individual state actors, presumable law enforcement officials, who entered the respective facilities without a warrant. Instead, the Plaintiffs assert the claim against the County Defendants and a Towns.

Here, Plaintiffs failed to assert sufficient facts to support the elements of a Fourth Amendment claim. Generally, Fed. R. Civ. P. Rule 8(a)(2) requires a plaintiff provide a

"short and plain statement of the claim showing that [she] is entitled to relief." *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008). Though specific facts are not necessary, the facts asserted must be sufficient to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955(2007). The Plaintiffs merely make the conclusory statements that the relevant Defendants "entered and searched[,] without a warrant[,] in violation of Plaintiffs'" Fourth Amendment rights. (SAC ¶ 456). For example, Plaintiffs allege that on June 14, 2023, Defendants Salina and Onondoga "conducted warrantless entry and searches in violation of fundamental Fourth Amendment rights of Hotel Candlewood Suites…. Defendant Salina also conducted a warrantless search and entry of the Candlewood Suites on May 22, 2023. SAC ¶ 457. The other allegations are similarly rote assertions that pertinent Defendants "conducted warrantless entry and searches". (*Id*. ¶¶ 457-60). Plaintiffs provide no context or factual backfill to support their Fourth Amendment claims.

It is well settled that in order to hold a defendant responsible for a constitutional deprivation, pursuant to Section 1983, a plaintiff must demonstrate, *inter alia*, the defendant's personal involvement in the deprivation. *Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). To do so, a plaintiff must "allege a tangible connection between the acts of a [d]efendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that

unconstitutional acts were occurring. *Grullon*, 720 F.3d at 139 (citation, italics, and quotation marks omitted).

These five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-Iqbal. See *Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017). Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint "fatally defective on its face." *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987) (internal quotation marks omitted). Here, Plaintiffs do not identify who conducted the search(s), what area(s), room(s) or item(s) were searched within the particular premises. The allegations lack any specificity whatsoever and are entirely conclusory.

To the extent, the Plaintiffs have attempted to assert a *Monell* claim against the municipalities, such claims similarly fail. See *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978). Generally, a municipality, such as a County or Town, cannot be held liable for violation of civil rights solely on the basis of the existence of an employer-employee relationship. Id. at   692. To bring a *Monell* claim against a municipality, a plaintiff must allege "the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [law enforcement] officer." *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (citation omitted), cert. denied, 480 U.S. 916 (1987).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or

supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

See *Brandon v. City of New York*, 705 F. Supp. 2d 261, 277 (S.D.N.Y. 2010) (internal citations omitted). Generally, a single incident involving actors below the policy-making level is insufficient to show a municipal policy. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). Plaintiffs fail to allege sufficient facts to support a plausible Fourth Amendment violation.

Accordingly, Plaintiffs' Fourth Amendment claims asserted on behalf of Crossroads, AIMS Newburgh, Armoni, and AIMS Orangeburg against Newburgh, Orange, Rockland, and Orangetown are deemed DISMISSED without prejudice.

## CONCLUSION

For the foregoing reasons, Plaintiffs and Defendants' motions are resolved as follows:

1. Plaintiffs' Motion for Preliminary Injunction is DENIED;

2. Defendants' Motion to Sever and Transfer Venue is GRANTED to the extent of severing all of Plaintiffs' claims as against: (1) Defendant Wyoming and TRANSFERRING said claims to the Western District of New York; and (2) Defendants Onondaga, Salina, and Colonie and TRANSFERING said claims to the Northern District of New York;

3. All claims asserted on behalf of the Asylum Refugees are deemed DISMISSED with prejudice on the basis that the Plaintiffs lack third-party standing;

4. All claims asserted against Chautauqua, Dutchess, Fulton, Herkimer, Niagara, Oneida, Otsego, Orleans, Broome, Madison, Rensselaer, Schoharie, Schuyler, Suffolk, Sullivan and Tioga  premised upon Emergency Orders which have

since expired, allowed to lapse without being renewed or replaced  are deemed DISMISSED with prejudice;

5. All claims asserted against Orange, Rockland, Onondaga, Saratoga, Genesee, Greene, and Oswego premised upon Executive Orders which were allowed to lapse and subsequently revised are deemed DISMISSED with prejudice;

6. Plaintiffs' First Cause of Action premised upon an alleged violation of Contract Clause is deemed DISMISSED without prejudice;

7. Plaintiffs' Second Cause of Action premised upon an alleged violation Title II is deemed DISMISSED without prejudice;

8. Plaintiffs' Third Cause of Action premised upon an alleged violation of Fourteenth Amendment Equal Protection and Due Process Clause is deemed DISMISSED without prejudice;

9.  Plaintiffs' Fourth Cause of Action premised upon an alleged violation of Section 1981 is deemed DISMISSED with prejudice;

10. Plaintiffs' Fifth Cause of Action premised upon an alleged violation of the Fifth Amendment Takings Clause is deemed DISMISSED without prejudice;

11.  Plaintiffs' Sixth Cause of Action premised upon an alleged violation of the Supremacy Clause is deemed DISMISSED with prejudice;[59]

12. Plaintiffs' Seventh Cause of Action premised upon an alleged violation of Section 1983 is deemed DISMISSED without prejudice; and

---

[59] Plaintiffs are not precluded from asserting pre-emption arguments.

13. Plaintiffs' Eighth Cause of Action premised on an alleged violation(s) of the Fourth Amendment asserted against Defendants Newburg, Orange, Rockland and Orangetown are deemed DISMISSED without prejudice.

The following Defendants have been dismissed from the action: Rensselaer, Broome, Oneida, Schuyler, Tioga, Herkimer, Oswego, Genesee, Greene, Chautaugua, Niagara, Sullivan, Fulton, Madison, Saratoga, Schoharie, Suffolk, Otsego and Orleans. Defendants Wyoming, Onondaga, Salina and Colonie have been transferred from this action. The remaining Defendants are Rockland County, Orangetown, Orange County, Dutchess County and Poughkeepsie.

The Plaintiffs shall have until June 2, 2025, to file an Amended Complaint as against the remaining Defendants consistent with this opinion. Should Plaintiffs fail to timely file an amended pleading, those claims dismissed without prejudice shall be deemed dismissed with prejudice. In the event Plaintiffs file an amended pleading, the remaining Defendants shall respond to the amended pleading on or before June 22, 2025. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 239, 345, 349, 350, and 353.

SO ORDERED:

Dated: May 5, 2025
      White Plains, New York

_____
     NELSON S. ROMÁN
     United States District Judge

121